**Mary GLOVER, et al., Plaintiffs,**

v.

**Perry JOHNSON, et al., Defendants.**

**Civ. A. No. 77–71229.**

United States District Court,
E.D. Michigan, S.D.

Sept. 14, 1989.

---

Charlene Snow and Deborah LaBelle, Detroit, Mich., for plaintiffs.

Susan Przekop–Shaw, Asst. Atty. Gen., Corrections Div., Lansing, Mich., for defendants.

MEMORANDUM OPINION
AND ORDER

FEIKENS, District Judge.

TABLE OF CONTENTS

INTRODUCTION

A. Glover I and Glover II

B. Decision of the U.S. Court of Appeals for the Sixth Circuit

C. Procedure on Remand

PART I

*Findings of Fact as of April 17, 1987*

A. Access to the Courts

   (i) Huron Valley Women's Facility

      (ii) Crane Facility

B. Educational Programming

  (i) Associate's Degree Programming

    (ii) Baccalaureate Programming

      (iii) Off-grounds Privileges

      (iv) Department's Response

C. Vocational programming

   (i) Inadequate Programming at HVWF and Crane

 (ii) Vocational Interest Survey Ignored

 (iii) Existing Programs Function Poorly

D. Apprenticeships

  (i) No Medical Records or Building Maintenance Apprenticeships

    (ii) Existing Programs Fail to Conform to Standards

E. Prison Industry, Trust Fund Payments and Wages

F. Off-grounds Programming and Work Pass

*Conclusion*

A. Access to the Courts

B. Educational Programming

    (i) Associate's Degree

   (ii) Baccalaureate Programming

C. Vocational Programming

D. Apprenticeships

E. Prison Industry, Trust Payments and Wages

F. Off-grounds Programming and Work Pass

PART II

*Compliance Subsequent to April 17, 1987*

A. Access to the Courts

    (i) Paralegal Training

        a. HVWF

        b. Crane

    (ii) Prison Legal Services

B. Educational Programming

    (i) Associate's Degree

    (ii) Baccalaureate Degree

C. Vocational Programming

D. Apprenticeship

E. Prison Industry and Wages

F. Off-grounds Programming and Work Pass

*Conclusion*

A. Access to the Courts

B. Educational Programming

    (i) Associate's Degree

    (ii) Baccalaureate Degree

C. Vocational Programming

D. Apprenticeships

E. Prison Industry, Trust Payments and Wages

F. Off-grounds Programming and Work Pass

PART III

*Findings Requested by the U.S. Court of Appeals for the Sixth Circuit*

A. History of Educational Offerings at all Michigan Corrections Institutions since the Court's 1981 "Final Order"

B. Current State of Educational Programs at all Michigan Corrections Institutions

C. Identity of Public and Private Colleges and Universities now providing educational programs to Michigan prison inmates, and the identity of the specific Michigan corrections facilities in which such programs are being offered

D. Per Capita Amount now being expended for two-year and four-year programs for women and for men at such institutions and the source of those funds

    (i) Per Capita Expenditure

    (ii) Source of Revenues

E. Efforts expended by the Department to comply with the Court's 1981 Order

F. Specific Manner in which the Department Has Not Complied

G. Estimated Total Cost and Per Capita Cost of Educational Programs leading to two- and four-year degrees

H. Development of a Detailed Plan for remedying the equal protection violation ...

PART IV—REMEDY

    (i) Contempt

    (ii) The Remedy

APPENDICES ∎

ORDER

## INTRODUCTION

On September 19, 1988, the United States Court of Appeals for the Sixth Circuit issued its mandate and judgment vacating my preliminary injunction order of October 20, 1986 and my order of April 17, 1987 appointing an administrator.** The court remanded the case for further factual findings regarding defendants' efforts to comply with my prior orders and for me to develop a detailed plan for remedying the equal protection violations I have already found. *Glover v. Johnson*, 855 F.2d 277, 288 (6th Cir.1988) (*"Glover III"*). This Memorandum Opinion and Order complies with the court's mandate.

### A. *Glover I and Glover II*

Female inmates in the custody of the Michigan Department of Corrections ("De-

** *See infra* Appendix A. [Appendix A omitted by the court for purposes of publication.]

partment") commenced this suit in 1977 and demanded that defendants and others, members of the Michigan Corrections Commission ("Commission"), provide them with educational and vocational opportunities comparable to those provided male inmates.*** On December 23, 1977, I certified a class action "on behalf of all female inmates in Michigan." *Glover v. Johnson,* 85 F.R.D. 1, 2, 7 (E.D.Mich.1977).

In 1977, Charmaine Cornish and Georgia Manzie, then inmates at Huron Valley Women's Facility ("HVWF"), filed a class action seeking declaratory judgment and damages based on alleged violations by the Department of their rights to equal protection and their right to access the courts. On March 17, 1978, I entered an order consolidating this case with *Glover v. Johnson,* Civil Action No. 77–71229.

After a bench trial, I found that the educational opportunities available to the Department's women prisoners were substantially inferior to those available to the Department's male prisoners; accordingly, I ruled that the Department violated the Equal Protection Clause of the Fourteenth Amendment. To guarantee the female inmates' right of access to these opportunities, I also found the Department obligated to provide a paralegal education course "to train female inmates to help themselves and each other in the presentation of their claims to the courts." *Glover v. Johnson,* 478 F.Supp. 1075, 1097 (E.D.Mich.1979) (*"Glover I"*).

On October 25, 1979, I entered an order setting forth in general terms the remedies the Department would be required to implement and I asked that it submit a plan detailing the steps to be taken to comply with the order. *Glover I* at 1102–03. On April 6, 1981, after extensive negotiations between the parties and consultations with

me, I entered a Final Order setting forth the remedies to be provided by the Department. *Glover v. Johnson,* 510 F.Supp. 1019 (E.D.Mich.1981) (*"Glover II"*). In addition to paralegal training, my orders require the Department to provide female inmates with post-secondary education, to implement various vocational and apprenticeship programs, to make use of off-grounds and work pass programs with eligible prisoners, to establish prison industry programs, to pay back wages to a trust fund established for the benefit of the women prisoners, and to re-evaluate and standardize the prisoner wage scale used by the Department to assure that it is applied to women fairly. Neither my 1979 nor my 1981 order was appealed from and, therefore, they are now law of the case. *See Glover III* at 281.

From 1981, until the issuance of my October 1986 injunction and the appointment of Dr. Richard Meisler as administrator in 1987, the major effort has been to compel compliance with *Glover I* and *Glover II.* The record of my attempts to prod compliance during these six years consumes thirteen pages of entries on the docket. Of particular note is my order of June 18, 1985 granting plaintiffs' motion for contempt with respect to the wages to be paid paralegal students at HVWF. *See infra* at 814–815, 829. It is significant because it is the first time, and by no means the last, that the Department has met the use, and threatened use, of my contempt power with studied indifference.

On January 22, 1986, plaintiffs brought their second motion for contempt, this time challenging broadly the Department's compliance. During the summer of 1986, I held ten days of evidentiary hearings,[1] took plaintiffs' motion under advisement, and began another round of negotiations aimed at achieving compliance. These proceed-

---

*** While neither the State nor the Department is a party to this suit, I will refer to the defendants collectively as "the Department" for the sake of clarity. These are Perry Johnson, Florence R. Crane, G. Robert Cotton, Thomas K. Eardley, Jr., B. James George, Jr., Duane L. Waters, William Kime, Robert Brown, Jr., Frank Beetham, Richard Nelson, Gloria Richardson, Dorothy Costen, and Clyde Graven. Robert Axford,

Conrad Mallett, Jr. and James H. Lincoln are current members of the Corrections Commission and, in the interests of justice (Federal Rule of Civil Procedure 21), are hereby added as parties so that the remedy herein provided can be carried out.

1. June 10; July 11, 21, 22, 23, 24, 25, 28, 29 and 31.

ings prompted the Department to arrange for Spring Arbor College ("Spring Arbor") to provide two baccalaureate courses commencing October 21, 1986. On October 16, 1986, I learned that the Department intended to provide this program only at HVWF and that qualified inmates desiring to enroll but residing at the Florence Crane Correctional Facility ("Crane") would be required to transfer to the overcrowded and higher security HVWF. After a hearing on October 20, 1986, I granted a preliminary injunction requiring the Department to provide courses at both HVWF and Crane beginning October 21, 1986. This order was not obeyed necessitating plaintiffs' third motion for contempt.

On October 31, 1986, the Department appeared to explain its failure to obey my order. It asserted that Spring Arbor was unwilling to proceed with the program at Crane. At a hearing held November 6, 1986, a representative of Spring Arbor, Paul J. Nemecek, indicated that courses could begin at Crane no earlier than January 12, 1987. I took plaintiffs' third motion for contempt under advisement.

The Department's unwillingness or inability to make progress towards implementing the programs ordered in *Glover I* and *Glover II* convinced me of the need for an independent administrator. After receiving recommendations from plaintiffs, the Department, and an advisory committee appointed by me, I named Dr. Richard Meisler as administrator.

### B. *Decision of the U.S. Court of Appeals for the Sixth Circuit*

The Court of Appeals concluded that I failed to comply with Federal Rule of Civil Procedure 52(a) when issuing the preliminary injunction because I did not adequately set forth factual findings supporting injunctive relief. Indeed, in its view, the record is devoid of factual findings that would justify the relief I granted. Particularly, the court said that I failed to demonstrate how denying the female inmates their right to an education would produce irreparable harm, why the harm to plaintiffs would outweigh the harm to the De-

partment, and why plaintiffs were likely to succeed. Moreover, the court said that I failed to address the Department's contention that it is incapable of compliance. *Glover III*, 855 F.2d at 284.

The Court of Appeals vacated my order appointing an administrator because it found that order "directly related to" and "generated by" my injunctive order. *Id.* at 285. More important, it determined that my order of appointment failed to document the "acts or ommissions of the Department that led [me] to conclude that the Department flouted [my] orders." *Id.* at 286. Moreover, it held that I had not demonstrated that use of less intrusive means, including my use of contempt power, would fail to bring about compliance. *Id.* at 287. Thus, the court found appointment of an administrator "excessively intrusive" into the Department's power to administer its penal system. *Id.* For purposes of determining an appropriate remedy the Court of Appeals suggested the following:

1. Making findings of fact "specifically detailing":

   a) the history of educational offerings at all Michigan correctional institutions since the court's 1981 "Final Order."

   b) the current state of educational programs at all Michigan correctional institutions.

   c) the identity of the public and private colleges and universities now providing educational programs to Michigan prison inmates, and the identity of the specific Michigan correctional facilities in which such programs are being offered.

   d) the per capita amount now being expended for two-year and four-year degree programs for women and for men at such institutions, and the source of those funds.

   e) the efforts expended by the defendants to comply with the court's 1981 order.

   f) the specific manner in which defendants have not complied.

   g) the estimated total cost and per capita cost of educational programs leading to two-and four-year degrees.

2. Developing a detailed plan for remedying the equal protection violation through ordering expenditures for educational programs for women inmates on parity with those already being offered to men, if any, on a per capita, not a total expenditure basis, *i.e.*, an educational program based on parity of expenditures rather than a plan requiring the same degrees, courses and subjects for both men and women.

*Id.* at 288.

I also note the concurring opinion of Judge Engel which emphasized that evidence of per capita expenditure is but one consideration in determining how to remedy the equal protection violations I have found. *Id.* He went on to comment:

The very difference between the sexes may mean in a given situation that the delivery of rehabilitative services may necessarily require the varied expenditure of monies because of the natural differences in the sexes or in their conditions of confinement. In short, I would not like to think that anything we have said here is construed to require or encourage an oversimplistic approach to what is in reality a difficult task requiring a full measure of judicial thought.

*Id.* at 289.

## C. *Procedure on Remand*

On November 4, 1988, plaintiffs renewed their motion that I find the Department in contempt with respect to all aspects of my orders in *Glover I* and *Glover II*. On November 29, 1988, I convened a hearing to determine future procedure. I ordered plaintiffs and the Department to submit proposed findings of facts together with citations to the existing record. Primarily for the purpose of allowing the Department to establish compliance with my orders subsequent to April 1987, I also ordered the parties to provide a list of proposed additional witnesses or evidence together with a summary of that testimony or evidence. I took five days of testimony in January 1989.[2] At the conclusion of that hearing, I ordered the parties to submit evidence relevant to the inquiry suggested by the Court of Appeals. I took six more days of testimony directed to that inquiry in April 1989.[3] The parties have now submitted final briefs.

I turn now to the difficult task to which Judge Engel averred. This Opinion proceeds in four parts. I set forth the facts as they existed on the date I appointed Dr. Meisler administrator in Part I. I discuss my findings relative to the Department's efforts at compliance subsequent to the appointment of Dr. Meisler in Part II. I respond to the inquiry of the Court of Appeals in Part III. I detail my findings on plaintiffs' motion for contempt and outline the remedies to be imposed in Part IV.

## PART I

### *Findings of Fact as of April 17, 1987*

I choose the date of my order appointing an administrator as the turning point in the history of this case for three reasons. First, as the Court of Appeals noted, I have yet to rule on plaintiffs' January 22, 1986 contempt motion. Second, the Court of Appeals did not reach the merits of the challenges to my orders. *Glover III*, 855 F.2d at 278. Therefore, the Court of Appeals has not ruled out appointment of an administrator or any other remedy that I might determine to be appropriate. It is important therefore to set forth the record as it existed at the time the Court of Appeals reviewed my orders. That record provides abundant support for my earlier rulings. The Court of Appeals is of the opinion that my appointment of an administrator was "generated" by the Department's response to my injunctive order. Unfortunately, the Department's reaction to that order was but the most immediate in a series of disappointments and frustrations spanning the history of this case. Nowhere is the Department's intransigence and its poor respect for the orders of this court better revealed than in the evidence presented in the June and July 1986 hearings on plaintiffs' motion for contempt. It

---

2. January 19, 20, 23, 24 and 27.

3. April 10, 11, 13, 17, 18 and 21.

is this evidence, far more than the Department's disregard of my injunctive order, that formed the backdrop for my appointment of an administrator.

Plaintiffs' 1986 motion for contempt attacked the Department's compliance with six different areas of my 1979 and 1981 orders: (A) Access to the Courts; (B) Educational Programming; (C) Vocational Programming; (D) Apprenticeship Opportunities; (E) Prison Industry, Trust Fund Payments and Prisoner Wages; and (F) Off-grounds Privileges and Work Pass Programs. I address the record in each area.

A. *Access to the Courts*

In *Glover I,* I determined that the HVWF law library met the constitutional standard established in *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), provided that the collection was properly updated and maintained. *Glover I,* 478 F.Supp. at 1096. I also determined that to assure plaintiffs' access to the courts it was necessary for the Department to provide paralegal training to the inmates. *Id.* at 1097, 1103. My 1981 Final Order required the Department to provide paralegal training to interested and qualified inmates until such time as there existed a pool of adequately trained female inmate assistants. My Order specifically incorporated the terms proposed by James S. Wilber, Director of Prison Legal Services of Michigan ("PLS"), as set forth in Part G of Defendants' Plan and Schedule of December 27, 1979.

Plaintiffs allege that as of April 1987 the Department had still not responded to my contempt order of June 18, 1985; that is, inmate paralegal trainees at HVWF were not being paid at the rate of $1.50 per day. Moreover, they allege that the paralegal training supposedly provided at HVWF was either nonexistent or so inferior as to be practically nonexistent. With respect to the Crane facility, plaintiffs allege that no paralegal training had been provided and

that the law library did not meet minimum constitutional standards. The evidence supports plaintiffs' contentions.

(i) Huron Valley Women's Facility

The terms proposed by James Wilber, and incorporated into my Final Order, call for paying inmate paralegal trainees at the rate of $1.50 per day. PLS provided the first paralegal training class between April 1982 and March 1983. The inmate trainees were paid at the rate ordered. The Department contracted for Washtenaw Community College ("WCC") to provide the second class, an advanced paralegal course which was taught during 1983. Plaintiffs consented to a different program provider with the understanding that no features of the program would be changed. Despite this assurance, inmates participating in the WCC program were paid less than the required rate. The Department hired a private attorney to teach the third paralegal class; students participating in that class were also underpaid. On June 18, 1985, I granted plaintiffs' motion for contempt and ordered the Department to pay inmate trainees $1.50 per day "forthwith." I also ordered it to pay back wages to trainees who had not received the full pay scale.

As of the July 1986 hearings, neither my 1981 Final Order nor my 1985 contempt order had been obeyed. Patrick Williams, the school principal at HVWF, testified that inmate trainees were being paid 25 cents per day. He was also unaware of any court order with respect to trainee wages. Deposition of Patrick Williams ("Williams Dep."), Mar. 26, 1986 at 128.[4] At the July 11, 1986 hearing, inmate trainees Letitia Crawford and Anita Alcorta confirmed Williams' report that inmate trainees were then being paid at a rate of 25 cents per day. They indicated that they had been told just prior to the hearing that they would soon receive the required $1.50 per day. Tr. July 11, 1986 at 7–8, 115–16. There is evidence indicating that the De-

---

**4.** The March 26, 1986 deposition of Patrick Williams was taken as a discovery deposition. Because both parties have cited discovery depositions as substantive evidence in their respective proposed findings of fact, I deem waived all

objections to the admissibility of the discovery depositions taken in contemplation of the 1986 contempt hearings.

All citations to testimony, depositions and transcripts refer to *Glover,* no. 77–71229.

partment is still not paying paralegal students at the required rate. *See infra* at 829.

More important than the Department's failure to pay trainees at the appropriate rate is its failure to provide appropriate training. The evidence indicates that there have been no introductory paralegal classes given at HVWF for the large part of the time since my Final Order was issued. Other than the programs taught by PLS between April 1982 and March 1983, by WCC during 1983 and by the private attorney, there have been no paralegal programs at HVWF. No introductory programs were offered between March 1983 and March 1986. The only advanced paralegal program was taught by WCC in 1983. That course was never completed. Tr. July 11, 1986 at 7; Williams Dep. Mar. 26, 1986 at 123–24 (no paralegal programming in 1985). *See also* Defendants' Response to Plaintiffs' Proposed Findings of Fact ("Def. Resp.") at 3–4, # 12, 14 (admits the same impliedly).

(ii) Crane Facility

However intolerable the situation with respect to paralegal training at HVWF was, the situation at Crane was worse. As of the summer of 1986 the Department had not offered any paralegal training at Crane. At the 1986 contempt hearings it indicated through its attorney, Susan Harris, that the Department had not scheduled paralegal training at Crane, and that it had no intention to do so. Tr. June 9, 1986 at 31–33. The Department's position was that because paralegal programming existed at HVWF, it was not obligated to provide it at Crane. *Id.* at 32–3. *See also* Testimony of Marjorie Van Ochten, hearings administrator for the Department, July 29, 1986 at 149–53. The Department's position respecting paralegal training at Crane is the same as that rejected by the Court of Appeals regarding educational programming at Crane. *See Glover III*, 855 F.2d at 280, 282.

The Department's position was unreasonable even before the Court of Appeals ruled. As the Department clearly understood, Van Ochten, July 29, 1986 at 151–52, the purpose of paralegal training was to assure female inmates access to the courts. The fact that the Department was, at least as of March 1986, fulfilling its responsibility with respect to inmates housed at HVWF, has no bearing on its obligation to assure access for inmates housed at Crane. Yet, the Department did not seek clarification from the court nor did it make inquiry as to whether there existed at Crane an adequate number of trained legal assistants.[5] *Id.* at 152, 166. It simply chose not to provide paralegal training at Crane.

The Department not only failed to provide paralegal training as required by my orders, they also failed to provide an adequate law library. When the Crane facility opened in April 1985, there was no law library. The first books did not arrive until six months later. *Id.* at 154–55. The library did not contain all the required materials until January of 1986. Testimony of Susan Fair, July 22, 1986 at 94–95. *See also* Testimony of Mary Johnson, July 31, 1986 at 79 (no M.C.L.A.s or M.S.A.s as of April 1986, inmates unable to respond to challenges to their parental rights).

The Department claims to have provided for the prisoners' needs by arranging for prisoners to use the law library at the Branch County Jail or by transferring prisoners desiring to use the law library back to HVWF. Yet, there is no evidence that the inmates were ever told of the availability of the Branch County Library. Indeed the evidence suggests that the prisoners were not so informed. *See* Testimony of Pat Balasco, July 29, 1986 at 184. Moreover, when inmate Susan Fair asked to be transferred to HVWF to use the library she was refused. Nor was she told of the availability of the Branch County Library. Fair, July 31, 1986 at 85–86. *Accord* Testi-

---

**5.** It appears that in July 1986 there were only two practicing inmate paralegals, Joyce Dixon and Susan Fair, for over 600 inmates at Crane and Crane Annex. Because Joyce Dixon is employed by PLS she is prohibited from helping prisoners with actions or grievances against the Department. Testimony of Susan Fair, July 31, 1986 at 84. Testimony of Mary Glover, July 11, 1986 at 52, 59–61. (Joyce Dixon is the only other paralegal at Crane).

mony of Sandra Girard, Director of PLS, July 31, 1986 at 67 (no transfers back to HVWF to use law library, no space available at HVWF).

There can be no question that the Department has disobeyed my orders with respect to court access. The Department cannot contend that the failure to pay paralegals at the ordered rate was due to the non-cooperation of some third party. Despite my contempt order, it simply chose not to pay. The Department excused its failure to provide paralegal services at Crane with the spurious argument that my orders did not apply to Crane. That position was belied by the Department's contrary stance with respect to library facilities. By arranging, or claiming to have arranged, for the use of the Branch County Jail Library, the Department implicitly acknowledged the applicability of my orders to the Crane facility. Apparently, the Department believes it has the right to pick the parts of my orders it wishes to obey and to ignore the rest. However, the parts of my court access orders that the Department chose to recognize (provision of paralegal training at HVWF and of a law library at Crane) were so ineptly executed that the practical effect was as if they had been ignored.

## B. *Educational Programming*

In *Glover I*, I found that the community college opportunities available to female inmates were generally comparable to those provided to male inmates. I stressed, however, the Department's obligation to maintain parity of programming and to facilitate and not impede the participation of women inmates in secondary education. My orders in *Glover I* and *Glover II* define the minimum characteristics of parity. The Department shall provide to all interested and qualified female inmates "a systematic and coherent course package which, when successfully completed, culminates in the receipt of an Associate's Degree." *Glover II*, 510 F.Supp. at 1021.

The Associate's Degree was to be such that it would enable entry into a four-year baccalaureate program. *Id.* I also required the Department to eliminate unnecessary scheduling conflicts and to provide all necessary course texts and materials. *Id.*

I did not order the Department to provide third- and fourth-year programming because the Department represented that funding cutbacks would all but eliminate the baccalaureate opportunities then available to male prisoners. I did order the Department to assist and cooperate in the establishment of four-year programs that any educational institution chose to offer. My Final Order in *Glover II* further provides that the assistance rendered female prisoners with respect to baccalaureate programming be "in no way" less than that afforded male prisoners. *Id.* This last requirement became more significant in October 1984 when Spring Arbor, which had been providing baccalaureate programming only to male prisoners residing in the State Prison of Southern Michigan ("SPSM"), received a line item allocation in the State budget. The Department understood correctly, *see* Plaintiffs' Exhibit ("P.Ex.") 34,[6] that such an allocation for male baccalaureate programming would, under my orders, require comparable support for third- and fourth-year degree programming for women inmates. The evidence as of April 1987 indicates that the Department fell far short of fulfilling its obligations under my orders with respect to post-secondary education.

### (i) Associate's Degree Programming

The Department had not by April 1987 provided a systematic and coherent community college course package to its female inmates. The evidence indicates that the courses desired by the inmates were not taught, Tr. July 11, 1986 at 62, 90, and that those courses actually taught were offered out of sequence. As a result there existed a pool of female inmates who had earned more than the required number of hours

---

**6.** Unless indicated otherwise the exhibits referenced throughout this Opinion do not refer to the exhibits admitted in the original trial of this case in 1979. The exhibits referred to are those admitted during the June and July 1986 hearings on contempt and the most recent hearings in January and April of 1989.

but still had no associate's degree because they had been unable to accumulate sufficient hours in their chosen subject area.

The cases of Letitia Crawford and Gladys Wilson are illustrative of the difficulties encountered by female inmates. Crawford began working toward an associate degree in criminal justice in 1982. Subsequently, the Department stopped offering classes in criminal justice. Crawford took up courses in business and accounting. Unable to find enough courses in business, Crawford simply took whatever was offered. Crawford then enrolled in a computer course only to discover, midway through the course, that the course was being taught out of sequence—the advanced course was taught before the prerequisite. Incredibly, the instructor learned of the error at the same time as the students. As a result, the students were given lower grades because the instructor did not believe the students to be working at the level of the advanced course. Testimony of Letitia Crawford, July 11, 1986 17–18, 22–23. Similarly, Wilson started out in psychology but found the same courses repeated time and time again. She then switched to criminal justice only to find the same repetitious offerings. Although she had accumulated 67 credits, seven more than needed, she was unable to obtain an associate's degree in either psychology or criminal justice. Testimony of Gladys Wilson, July 21, 1986, 90. *See also* Glover, July 11, 1986 at 62, 72–73.

The evidence indicates that the Department contributed in many ways to the incoherence of the Associate's Degree Program. First, the absolute number of course offerings declined between 1981 and 1987. Williams Dep. July 31, 1986 at 160–61; Tr. July 28, 1986 at 47. Moreover the Department failed to take an active role in planning course offerings. For instance in 1985, Williams did not participate in planning the courses to be offered by Schoolcraft College ("Schoolcraft") even though Williams was aware that Schoolcraft did not have the necessary information to plan appropriately. As a consequence, Schoolcraft resorted to offering standard introductory courses which were repetitious of the courses previously offered by other institutions. Indeed, there is some evidence to suggest that Williams was unaware of the courses that were taught previously. Williams Dep., July 31, 1986 at 84–87, 150–54. Moreover, it appears that the Department discourages inmate participation in the community college program by offering one of the lowest wage rates for any type of prison activity. *See* Williams Dep., July 31, 1986, at P.Ex. 24 and 26. Contrary to my orders, the Department did not provide necessary textbooks for the courses; the students were required to purchase the books. Tr. July 11, 1986 at 14–16. My orders require the Department to assure the availability of academic counseling in advance of the commencement of classes. Yet, it appears that the first visit by an academic counselor to HVWF occurred on July 30, 1986. Williams Dep., July 31, 1986 at 157–58.

(ii) Baccalaureate Programming

Although not initially required by my orders to provide baccalaureate programming to the female prisoners, I did require the Department to do no less for its female inmates than it does for its male inmates. Spring Arbor has been providing four-year degree programming at SPSM since 1981. During each year of that time period forty inmates have received baccalaureate degrees. By October of 1984, the Department's assistance to the male prisoners had become so extensive that it made sense to include it as a line item in the Michigan Department of Education's budget. At that time, even the Department recognized that my orders required that comparable programming be made available to the women. Yet, by April 1987, this had not occurred.

The Department admits that no four-year degree programming was offered at HVWF in 1979, 1980, 1981, 1982, 1984, in the fall of 1985 or the spring of 1986. Plaintiffs' Proposed Findings of Fact ("P.Findings.") at 45, # 5; *cf.* Def. Resp. at 12, # 5. Eastern Michigan University ("EMU"), which provided programming in 1983 and in the spring of 1985, was not adequately paid for its services. As a re-

sult EMU declined to provide further services to the Department. More important, EMU withheld credit from the participating inmates and refused to release their transcripts. At July 1986, some students had still not received credits earned. Tr. July 11, 1986 at 64. Understandably, the interest of the participating students, and those learning of their ordeal, in continuing post-secondary studies was diminished. The reasons why EMU was not paid in 1983 are not entirely clear. It appears, however, that the Department was substantially responsible for the difficulty attending the 1985 course offering.[7] After the completion of, and in light of, the hearings on contempt, the Department arranged for Spring Arbor to provide baccalaureate programming at HVWF. These programs began October 21, 1986.

The untoward events surrounding the provision of baccalaureate courses at Crane in the fall of 1986 have already been recounted in the introduction to this opinion. I need only add that even after I had clearly informed the Department of its obligations under my orders in the show cause hearing, and threatened to use my contempt power, no heed was paid to my orders. Despite Nemecek's indication that Spring Arbor could begin classes by January 12, 1987, there were still no baccalaureate courses at Crane as of April 1987.

### (iii) Off-grounds Privileges

My 1981 Final Order specifically requires the Department to provide off-grounds programming for eligible inmates unable to complete their course work at the correctional facility. *Glover II*, 510 F.Supp. at 1021. Yet, the Department has not made off-grounds programming available despite the existence of interested and eligible inmates. Tr. July 11, 1986 at 21, 69, 93; Tr. July 21, 1986 at 91; Williams Dep., Apr. 9, 1986 at 56–57, Williams Dep., July 31, 1986 at 158; Deposition of Tekla Miller ("Miller Dep."), Apr. 29, 1986 at 24–26.

### (iv) Department's Response

The Department contends that its noncompliance should be excused because of the lack of sufficient interest in post-secondary educational programming on the part of both the providing institutions and the inmates.

I find abundant interest on the part of the female inmates, *e.g.*, Williams Dep., Apr. 9, 1989 at P.Ex. 7 (12–15 women who were qualified and interested in pursuing a four-year degree program); Tr. July 11, 1986 at 19, 63, 67, 69, 73–74, 77, 91–93 (Testimony of various prisoners regarding difficulties encountered pursuing post-secondary education); Tr. July 22, 1986 at 45 (Mary Johnson transferred to Crane on the same day she was scheduled to begin EMU classes at HVWF); Tr. July 21, 1986 at 90–91; Tr. July 11, 1986 at 92–93 (Gladys Wilson and Joyce Dixon refused off-grounds privileges despite unavailability of needed courses at the facility); Miller Dep., Aug. 8, 1986 at 34–35 (there exist inmates interested in off-grounds programming). What is surprising is the persistence shown by these inmates. Given the disjointed programs, the uncertainty of receiving credit for work performed, and low wages, it would be entirely natural for the inmates to want no part in what for many students has become an exercise in disappointed expectations. Indeed there is evidence that otherwise interested inmates have been dissuaded by the prospect of entering programs in which the difficulty of bureaucratic struggle exceeds that of learning. Williams Dep., Apr. 9, 1986 at 48 (Williams agrees that poor response to announcement of EMU classes may be due to history of students not receiving credit for work done.); *see also* Williams Dep., Mar. 26, 1986 at 137; Tr. July 11, 1986 at 64.

There can be little question that the commitment of various educational institutions has been less than one would hope for from institutions dedicated to public service. The problem is really one of economic incentive. Significant funding for prisoner

---

7. EMU billed for its services on August 19, 1985. The Department did not remit payment until October 1985. The delay in payment caused a bureaucratic snafu on the part of EMU which took nearly six months to straighten out. Williams Dep. March 26, 1986 at 129; Williams Dep. April 9, 1986 at 29, 48–9; Statement of Susan Harris, Tr. June 9, 1986 at 26.

post-secondary education comes from Pell Grants paid directly to the provider institutions. Pell Grants are based on the number of students enrolled, not the cost of providing education. The provider institutions have been unwilling to provide programming for the female prisoner unless guaranteed a minimum return for their efforts. Given the relatively small number of female prisoners, this return is difficult to achieve without Department subsidy. The Department has been unable or unwilling to solve this "critical mass" problem. A second problem, as demonstrated by the fiasco with EMU, is that the Department has at times simply not fulfilled the obligations undertaken to the institutions.

It may be that the uncooperative attitude of the provider institutions accounts partially for the failure to provide adequate post-secondary education to the female inmates. I hasten to add that the constitutional obligation of the State, and thus the Department, is nondelegable. If impossibility can ever be a defense in a case such as this, it must be impossibility in the strictest sense—that no one in the world can perform the required acts. The inability of the Department, whether willful or not, to overcome the obstacles in providing post-secondary education to the female inmates was abundantly clear as of April 1987. Professor Otto Feinstein described the problem in this way:

> In my experience, particularly ... with ex-offenders and people who are incarcerated, ... if you want to mesh, ... officially with the behavior of the educational institution, or in this case the Department of Corrections, and the educational institutions, you need some person ... or office that meshes those relations long enough [so] that you have a pattern that is satisfactory to the clients, in this case the inmates or the ex-offenders.... If that is not done, if it is assumed that the bureaucracy will function on its own and keep focused ... until all these problems are resolved, the evidence is largely that it will not occur and that is what I was looking for in the documents

> [in this case]. ... I saw the symptoms of this institutional glitch....

Tr. July 28, 1986 at 50–51.

I concluded that an administrator could help solve this institutional glitch.

### C. *Vocational Programming*

In *Glover I,* I found the range and quality of vocational programming available to female inmates to be substantially inferior to that offered to male inmates. In 1979 the male prisoners benefited from more than twenty vocational programs teaching skilled trades such as automobile servicing and drafting; the female prisoners had available five programs which developed only elemental skills. I found the women prisoners "entitled to a greater variety of programming...." *Glover I,* 478 F.Supp. at 1087. I ordered the Department to begin forthwith a vocational counseling and testing program to be followed by a survey of the women's vocational interests and to implement those programs found to have significant inmate support. I ordered that the programs be "taught, funded and equipped" in a manner comparable to the vocational programs offered the men and that the programs offered prepare the inmates for "non-menial" positions in the fields selected. *Id.* at 1102. By April 1987, however, the female prisoners had fewer, not more, vocational programs; the Department had largely ignored the results of the ordered survey, and the programs actually offered were deficient.

#### (i) Inadequate Programming at HVWF and Crane

There were five vocational programs available to HVWF inmates in 1979: food service, office occupations, graphic arts, building maintenance and general shop. By July 1986 only three programs remained. The programs in general shop and building maintenance were eliminated. The Department made no effort to replace the general shop program. The building maintenance program was replaced by a program entitled "Introduction to Tool Technology" ("ITT") in October 1983. As I shall discuss later, the ITT program was

not intended to, nor does it, serve as a vocational program.

From the time the Crane facility opened in April 1985 until October 1986, eighteen months, there was no vocational programming. In October 1986, after the contempt hearings, but before the appointment of Dr. Meisler, the Department began offering a program in television production. Whatever the merits of this program, and they are questionable, I find it incredible that the Department made absolutely no effort to assure continuity of programming between HVWF and Crane when it knew that Crane would be populated almost entirely by inmates transferred from HVWF. Women arriving at Crane discovered that their vocational training was wasted because it could not be continued at Crane. If they arrived at Crane after October 1986, their only option was to start anew in television production.

(ii) Vocational Interest Survey Ignored

In October 1980, after a year of little progress, I ordered the appointment of Martha Stein to serve as Vocational Programming Coordinator for HVWF. From 1980 until 1984, Stein developed—with the help of a board of independent advisors, the Huron Valley Women's Facility Vocational Assessment and Advisory Committee—a vocational testing and counseling program which came to be known as "Project Grow" (Greater Resource Opportunities for Women). Over the years, Project Grow engaged in vocational counseling and surveyed inmate occupational interests.

The Department failed to implement the programs recommended as a result of

Project Grow. Testimony of Patricia Curran, July 28, 1986 at 96; Deposition of T.A. Ryan ("Ryan Dep."), July 29, 1986 at 128–30. *See also* Testimony of Marilyn Marshall, June 10, 1986 at 61 (no programming in the health care area).

The failure to implement these programs may have been due to the fact that the Department had not fully integrated the vocational training programs, especially vocational counseling, into the day-to-day management of the prison. Marilyn Marshall, who replaced Stein in April 1985, testified that she had very little professional contact with Patrick Williams, the school principal at HVWF. This is extraordinary because the school principal is in charge of vocational programming. *Id.* at 52. Similarly, there is evidence of poor communications between the vocational coordinator and the prison classification director. Testimony of Patricia Curran and David King, July 28, 1986 at 86–88, 113–15. This is troubling because the classification director determines inmates' eligibility for educational programming. As a consequence of this lack of communication, inmates needing, and interested in, training have been assigned to institutional jobs. Marilyn Marshall, June 10, 1986 at 30–34. *See also* David King, July 28, 1986 at 106, 116–17.

(iii) Existing Programs Function Poorly

The programming actually available to the women prisoners was sorely deficient. Of the programs offered at HVWF only the graphic arts and office occupations programs functioned reasonably well.[8] The ITT program was not a vocational program at all and the food service program provid-

**8.** This is not to suggest that these programs operated entirely without difficulty. I note particularly that the word processors for the office occupations program were in a continual state of disrepair; none of the word processors were functioning between November 1985 and March 1986. The Department had not arranged a maintenance contract for the word processors as of July 1986. There is no indication that a maintenance contract has since been procured.

The graphic arts program improved in many respects between 1979 and 1987. As of July 1986, the HVWF graphic arts program was responsible for printing all the forms used by the

Department as well as two prison newspapers. The graphic arts instructor, Kenneth Stock, testified that those persons actually completing his photo-typesetting course would find a demand for their skills outside the prison walls. Unfortunately, the high rate of transfers to the Crane facility has made completing Mr. Stock's program difficult. *See infra* at 821–822. Stock also testified that he lacked certain basic equipment, particularly equipment for offset printing. Testimony of Kenneth Stock, July 22, 1986 at 104–10, 116–17. Finally, there was no program in graphic arts at Crane despite a generally high level of inmate interest. *Id.*

ed only entry-level skills. Moreover, the Department's practice of transferring vocational students to Crane midway through their training often stifled the little vocational education that was occurring.

Williams admitted in his deposition that inmates would not develop vocational skills by participating in the ITT course. Williams Dep., July 31, 1986 at 30. The program was intended to provide "hands-on" experience so the participants could determine their interest in related instruction. *Id.* at 28–30. It succeeded only in convincing the participants of the futility of their efforts. The women spent the large part of their time studying pictures of various tools. *See, e.g.,* P.Ex. 11. Their "hands-on" experience consisted mostly of producing sundry personal items such as jewelry boxes. *See* Testimony of Delores Federico, July 22, 1986 at 5–16. In sum, the program was more akin to high school arts and crafts than a pre-vocational course.

In the 1986 contempt hearings plaintiffs contended that the vocational food service program had changed little since 1979. As in 1979, they alleged that the men had a food service program offering full commercial training whereas the women's program taught only home economics. They complained particularly that the equipment available to women was not commercial grade.

Sylvia Coleman, the food service program instructor, testified that the equipment available was adequate and in some respects better than the equipment available to the men at Huron Valley. Testimony of Sylvia Coleman, July 22, 1986 at 119–20, 124–25. Defendants' vocational expert, T.A. Ryan, concurred. Ryan Dep., July 29, 1986 at 101–02. Marilyn Marshall, the vocational coordinator, and Jane Chapman, plaintiffs' vocational expert, main-

tained that the equipment was not commercial grade. Testimony of Marilyn Marshall, June 10, 1986 at 43–44; Testimony of Jane Chapman, July 24, 1986 at 213–14. The chief difference between the equipment available to the Huron Valley men and the equipment available to the women is scale; the male residents have access to the commercial kitchen used to prepare food for the institution [9] whereas the women's equipment is designed for food preparation on a smaller scale. The parties disagree as to whether the difference in scale matters.

T.A. Ryan testified that the positions available to graduates of the 1986 HVWF vocational food service program were limited to work in fast food restaurants at minimum wage or as an assistant cook or hostess for wages slightly above minimum wage. Ryan Dep., July 29, 1986 at 102–04. Chapman testified that the vocational food service program resembled a home economics course rather than the commercial food service courses usually taught in a junior college or a prison setting. Chapman, July 24, 1986 at 213. Her opinion finds support in the background and training of the course instructor. Coleman testified that her training and prior experience were in the field of home economics; she admits that her chief exposure to commercial food service was when she made salads as part of her summer waitressing job during high school and college. Coleman, July 24, 1986 at 222. Instructors usually teach, and students generally learn, the subjects in which they have expertise. Here, that subject appears to be home economics. Moreover, there was general agreement that the space allotted to the food service program was inadequate. Ryan Dep., July 29, 1986 at 101; *cf.* Marshall, June 10, 1986 at 43–44. Whatever the relative caliber of the equipment available to the women, it appears that the quality of the program has improved little since 1979.

---

**9.** The controversy concerning the commercial kitchen at Huron Valley is symbolic of the history of this case. At the 1979 trial, the Department, through Michael Smail, represented that the women's vocational food service program would have access to the kitchen. *Glover I,* 478 F.Supp. at 1088. I accepted and relied on that representation. *Id.* When the Department be-

gan housing men at Huron Valley, the kitchen was assigned to the men and the women were no longer permitted to train there. Coleman, July 24, 1986 at 223. This is yet another example of the Department's disregard for commitments made to this court and of the Department's pattern of satisfying the needs of its male prisoners at the expense of its female prisoners.

Another difficulty encountered in fashioning adequate vocational programming, even where the program itself is reasonably successful, was that inmates were often transferred from HVWF to the Crane facility in the midst of their training. A transfer would most often end an inmate's instruction because Crane had virtually no vocational programming. This produced a sense of futility on the part of both the transferred inmate and the inmates left behind.

Although the Department made it a policy not to transfer students in the midst of educational programming, this policy was honored more in the breach than in the observance. For example, Stock testified that one of his graphic arts students was transferred to Crane during her training. Stock was allowed no input into the transfer decision nor was he given advance notice of the transfer. Stock, July 22, 1986 at 116. *See also* Miller Dep. (Warden HVWF), Aug. 8, 1986 at 13, 31–32 (inmates participating in vocational programs are not supposed to be transferred but sometimes are); Crawford, July 11, 1986 at 26–28 (high numbers of transfers from HVWF to Crane caused the class to be disrupted frequently); Testimony of Tammi Gregory, July 22, 1986 at 80, 84–85 (Gregory transferred to Crane two months into her vocational program); King, July 28, 1986 at 117–18 (transfers occurred without notice to the classification director at HVWF).

As of April 1987 the vocational programming available to the female inmates was seriously flawed. There was an insufficient variety of programming and poor execution of the programs actually offered. In its proposed findings, and in its response to plaintiffs' proposed findings, the Department makes little effort to refute this fact. Instead, its defense is based on the contention that there have been improvements since April 1987. I shall consider the Department's contentions with respect to improved conditions in Part II.

D. *Apprenticeships*

I determined in *Glover I* that the female prisoners were entitled to apprenticeship training. In 1979, the Department's male prisoners had the potential to participate in apprenticeships in ten separate trades such as millwright, tool and die maker and industrial maintenance electrician. At SPSM, prisoners were able to practice their apprenticeship in conjunction with prison industries. In 1979 there were no apprenticeships or prison industries at HVWF. *Glover I,* 478 F.Supp. at 1089.

In 1981 I ordered the Department to institute within six months apprenticeships in five areas: Medical Records, Building Maintenance, Dental Assistance, Painting and Carpentry. These programs were set forth in the Standard of Apprenticeship ("Standards") compiled by the Huron Valley Women's Facility Multi–Crafts Joint Apprenticeship Committee ("Committee"). P.Ex. 9. The Standards were incorporated into my 1981 Order. I further ordered the Department to take "whatever steps necessary to ensure compliance" with the Standards. I also ordered the Department to mount an informational campaign in conjunction with the Committee to inform the prisoners of the availability of apprenticeships and their nature. *Glover II,* 510 F.Supp. at 1021–22.

As of April 1987, six years rather than six months later, only three of the five ordered programs were in operation. None of the three programs in operation conformed to the Standards. Various steps necessary to implement the apprenticeship, particularly the construction of an apprenticeship building at HVWF, had not been completed. There were no apprenticeships offered at Crane.

(i) No Medical Records or Building Maintenance Apprenticeships

A medical records program did exist for a time at HVWF. It ceased functioning in 1984 when the apprenticeship instructor retired. By July 1986, close to two years later, the instructor had still not been replaced. Defendant's Proposed Findings of Fact at 3; Williams Dep., Mar. 26, 1986 at 56–57; Chapman, July 23, 1986 at 141 (no instructor for medical records apprenticeship); King (HVWF classification director) July 28, 1986 at 120 (no medical records

apprenticeship at HVWF). Similarly, there was no building maintenance apprenticeship as of April 1987. Ryan Dep., July 29, 1986 at 116–17; Williams Dep., July 31, 1986 at 70 (building maintenance not including in Williams' list of existing apprenticeships); Chapman, July 23, 1986 at 140; Marshall, January 19, 1989 at 168. As of the time I appointed Dr. Meisler there was neither a vocational nor an apprenticeship program in building maintenance, although I had ordered institution of both. *See supra* at 819, 822.

### (ii) Existing Programs Fail to Conform to Standards

The three existing apprenticeship programs did not conform to the Standards. The most significant flaw in both the painting and carpentry apprenticeships was that the apprentices did not receive the required hours of related academic instruction. Margaret Neal, an apprentice in painting, testified that she had no teacher for her academic work; C. Rollins, the painting instructor, gave no lectures. During the four and one-half years of her apprenticeship she was given but a single text to work with on her own. Neal testified that she exhausted this text in 1985 and had not since received new academic materials. Contrary to the Standards, *see* P.Ex. 9, classroom instruction was not given every year during the time that Neal was a painting apprentice. Testimony of Margaret Neal, July 21, 1986 at 29, 33.

Academic instruction in carpentry did not begin until March 1986. Testimony of Linda Greene, July 21, 1986 at 79–80; Testimony of Robert Blunden, July 21, 1986 at 44–50. In practice the carpentry instructor's principal job was prison maintenance and construction. His energies were devoted primarily to fulfilling institutional needs including construction of the vocational building I ordered built. Blunden, *id.* at 43, 50–54. He had little time or desire to develop and teach the academic component of the apprenticeship. He did so only when asked by Williams. The timing of Williams' request, March 1986, was no doubt influenced by the pendency of plaintiffs' motion for contempt. *Id.* at 62.

Linda Greene, a carpentry apprentice, testified that the on-the-job training component of the apprenticeship consisted principally of watching and helping the instructor do his work. Testimony of Linda Greene, July 21, 1986 at 78; Blunden, July 21, 1986 at 52–55. This work at times consisted of changing light-bulbs throughout the prison. Blunden, *id.* at 52–53. The instructor was so irked by the lightbulb-changing assignment that he pursued a grievance through his union. *Id.* at 53.

The Department does not dispute the allegations concerning the painting and carpentry programs; rather it attempts to excuse noncompliance. First, the Department notes that none of the painting apprentices has completed the required total number of hours. Def.Resp. at 6, #10. The point of this cryptic argument seems to be that the apprentices had plenty of time left to make up the missed academic work. By this logic a school boy should not complain when he is not taught reading and writing in first grade because he has all of elementary school, high school and college to learn how to read and write. Second, the Department makes a hypertechnical argument that the Standards merely recommend, but do not require, provision of 144 hours per year of related academic training. The passage cited by the Department appears on page 12 of the Standards. The heading on page 12 reads: "Check–List of Apprenticeship *Fundamentals* and Supplemental Program Information". The cited language reads: "Provision for organized, related and supplemental instruction in technical subjects related to the trade. A *minimum* of 144 hours for each year is *recommended.*" P.Ex. 9 at 12 (emphasis added). I cannot agree that the Department can ignore the Standards' "minimum recommendations" on apprenticeship "fundamentals." The frivolousness of this argument becomes obvious upon examination of Section 13 of the Standards:

The apprentice, during each year of her apprenticeship *shall be required* to attend *not less* than 144 hours of related supervised study and testing sessions. In case of failure of [sic] the part of any

apprentice to fulfill the obligations, the Joint Apprenticeship Committee *shall* suspend or revoke her agreement.

P.Ex. 9 at 6 (emphasis added).

Clearly, if the apprentice is required to attend 144 per hours a year of related instruction, the Department is required to provide it. Moreover, there is no theory by which the Department can excuse its failure to provide any academic instruction in carpentry prior to March 1986.

The dental assistant apprenticeship was one of the few programs that actually worked. There were two dental assistants indentured to the program. Mary Fournier, one of the apprentices, testified that the quality of the apprenticeship suffered until Dr. Smith was hired as the HVWF dentist in January 1986. Testimony of Mary Fournier, July 21, 1986 at 11–13. At that time the quality of the program improved dramatically. *Id.* Fournier obtained substantial training during the short period of time she worked with Smith. *Id.* The Department, however, decided to discontinue the dental program after the two existing apprentices had been certified.

The dental assistant apprenticeship requires apprentices to handle dental instruments and to perform procedures on patients under the supervision of a dentist. The apprentices also have access to inmate dental records. The Department contends that its own policies and the accreditation standards of the American Correctional Association ("ACA") forbid inmates to possess surgical instruments, to perform medical procedures on fellow inmates, or to have access to inmate medical records. Defendants' Proposed Findings of Fact at 5, # 7.

The proofs with respect to ACA standards are sketchy. There is testimony suggesting that the ACA conducted an audit at HVWF in October of 1984 and that the audit determined that the dental program violated ACA standards. Williams Dep.,

Mar. 26, 1986 at 110–15; Miller Dep., April 29, 1986 at 87–97, Ex. 1; Deposition of Dan Bolden ("Bolden Dep."), Aug. 1, 1986 at 23–27, 47–52. Evidently, the Department pursued relief through the ACA and a second audit was conducted in December of 1984. Bolden Dep., *id.* The 1984 audit also found the dental program to violate ACA standards. Nonetheless in January 1985, HVWF's accreditation was renewed. Miller Dep., *id.* at 94.

Plaintiffs maintain that the ACA provides an exception to its standards to facilitate accredited vocational programs. They argue that the ACA found the dental program in violation primarily because the Department failed to provide adequate academic instruction. Williams Dep., Mar. 26, 1986 at 113–14. What evidence there is supports plaintiffs' position.[10]

I accept that there may exist valid reasons why prisoners should not be permitted to possess surgical instruments or perform medical procedures on other inmates. I am troubled, however, by the way the Department approached this difficulty.

The description of the dental apprenticeship in both the HVWF Standards, P.Ex. 9 at Appendix G, and the Standards of Apprenticeship for the Department, P.Ex. 10, clearly contemplates that the apprentices will use dental instruments and perform dental procedures. The Department raised no objection, not even with respect to its own policies, when these standards were promulgated in 1980 and again in 1983. Moreover, the Department did not seek relief in this court until plaintiffs' contempt motion was brought nearly a year after the position of the ACA, according to the Department's own factual account, became final. Rather than seek a modification of my order, the Department simply resolved to disobey it by discontinuing the program.

Whereas the Department may be sincere in its belief that ACA standards prohibit it

---

**10.** The last sentence of the applicable ACA standard, 2–4288, states: "These restrictions, however, should not preclude inmates from participating in a certified vocational training program." P.Ex. 28. The audit reports suggest that the visiting committee's finding of noncompliance would have been different had there been adequate classroom training and an opportunity for licensure or certification. *See* Williams Dep., Mar. 26, 1986, Ex. 2; Miller Dep., Apr. 29, 1986, Ex. 1 at 2.

from providing an effective dental apprenticeship, its same position with respect to the medical records apprenticeship is disingenuous. The Department argues that it cannot provide an effective medical records program because its policy and ACA standards prohibit inmates from having access to other inmates' medical records. Defendants' Proposed Findings of Fact at 4, # 2. Without contesting the merits of the Department's policy or the ACA standards, it is apparent to me that an effective medical records program can be offered without violating these policies. Unlike the dentistry program, there is no need to use actual inmate records. The Department may teach record-keeping skills with fictional files, actual records of deceased non-prisoners, or by redacting inmate files to assure anonymity. The Department's attempt to bootstrap a possibly legitimate excuse for discontinuing the dental apprenticeship into an excuse for failing to provide an apprenticeship in medical records casts doubt on the Department's credibility in relation to both programs.

As of April 1987, the Department had failed to provide apprenticeships in accordance with my 1981 Order. Two of the five programs were not in operation; the remaining programs were fundamentally flawed, principally because the prisoners did not receive the required related instruction. Moreover, it was clear from my 1981 Order that the Department was to add new apprenticeships. This the Department clearly did not do. The opening of the Crane facility only heightened the Department's obligation to provide additional programming. By April 1987 there were still no apprenticeships at Crane.

### E.  *Prison Industry, Trust Fund Payments and Wages*

In 1979, the Department operated prison industries at four men's prisons. Prison industries did not exist at HVWF, the only women's facility. I determined that female prisoners were entitled to participate in prison industries because the State chose to operate prison industries for its own benefit as well as the benefit of the inmates who would gain employment and rehabilita-

tion thereby. *Glover I,* 478 F.Supp. at 1090–91. My 1981 Final Order required the Department to establish two prison industries, manufacture of license plate tabs and chair cushions, at HVWF by January 1982. My order did not require, or preclude, the creation of additional prison industries at HVWF.

In 1979, I determined that women prisoners assigned to institutional work details were paid less than male prisoners assigned to perform similar work at comparably sized institutions. *Id.* at 1091–92. I also noted that no position at HVWF was classified at the highest of the five prisoner pay levels. *Id.* at 1092. I did not find the Department's wage classification system unconstitutional as applied; I did note, however, that the wage discrepancies between male and female prisoners required "serious attention."

My 1981 Final Order provided more concrete relief. It incorporated an Interim Order dated September 8, 1980. The 1980 Order established a trust fund ("Trust"), now known as the Judith Magid Trust Fund, to receive payment of back wages that would have been earned if a prison industries program would have been operating at HVWF in January of 1980. *Glover II,* 510 F.Supp. 1022, 1025–27. My order required the Department to make quarterly payments for at least eight quarters "or until such time as a full industry program is operating at Huron Valley." *Id.* at 1022. I also ordered the Department to review its wage classification system to assure fair application to women whose job functions are "comparable to those performed by male prisoners at similarly sized institutions." *Id.* at 1022–23.

Plaintiffs make several allegations concerning the Department's adherence to my orders concerning prison industries and wages. The Department has admitted the accuracy of most of these allegations. *See* Def. Resp. at 17–18.

Plaintiffs allege, and the Department admits, that prison industry programming did not begin at the Crane facility until March 1986, nearly ten months after it opened.

*See* P. Findings 60, # 1–4; *cf.* Def. Resp. at 17, # 1–4. The Department also admits that at least some of the women prisoners employed in industry at Crane between March 1986 and July 1986 were substantially underpaid. P. Findings at 60, # 5; *cf.* Def. Resp. at 17, # 5. The Department also acknowledged that female inmates employed by prison industries not infrequently lost their jobs as a result of transfers from HVWF to Crane. P. Findings at 61, # 7–8; *cf.* Def. Resp. at 17, # 7–8.

The Department does dispute plaintiffs' contention that it has not made the final payment due the Trust. I find that payment is due. Plaintiffs aver that the Trust is due payment for the months of January, February and March of 1985. P. Findings at 61, # 9; *cf.* Def. Resp. at 17, # 9. The Department maintains that payment was due only through December 1984; it has admitted by implication that payment has not been made for the first three months of 1985. *See* Defendants' Proposed Findings of Fact at 29, # 3. My Order requires payments to continue "until such time as a full industry program is operating" at HVWF. *Glover II*, 510 F.Supp. at 1022. The Department's counsel at the time, Assistant Attorney General Brian MacKenzie, wrote on March 11, 1985 to inform me that the industry program was in full operation "as of this date." P.Ex. 16. There has been no suggestion by the Department that the industry program was in full operation prior to MacKenzie's letter. Therefore, under the terms of my 1981 Order, payment for the first three months of 1985 is due.

The Department attempts to obfuscate the issue by suggesting that MacKenzie's purpose was to inform the court that the Department would cease payments as of the end of December 1984. It advises that when MacKenzie wrote that the Department would cease payments "commencing with the second quarter of this year," *id.*, he meant the second quarter of the Department's fiscal year which commences in January. Testimony of Marjorie Van Ochten, July 29, 1986 at 134–43. The date when the Department intended to cease payments is irrelevant. Payments were to continue until the industry program was in full operation; the uncontradicted evidence is that the industry program was not in full operation until March 11, 1985.

Plaintiffs also maintain that wage discrimination persists. They allege that institutional jobs carrying the highest level job classification are not made available to women prisoners. They further allege the Department's wage classification standardization system has led only to greater disparity between male and female inmate wages. There is some evidence to support their contentions. For instance, women inmates working on the HVWF food service detail cannot be paid at the highest level, 05, because that level is reserved for cooks. The food for HVWF is prepared at the Huron Valley Men's Facility and shipped over to HVWF. Because no cooking is done at HVWF, there is no need for cooks and the women's opportunity to receive 05 level pay is reduced concomitantly. Gladys Wilson, an inmate at Crane, testified that the implementation of the Department's wage standardization program in July 1986 resulted in many of the female prisoners being paid less. Wilson, July 21, 1986 at 100–01.

I observed in my 1979 Opinion that the wage discrimination resulted from the "generally lower quality of the programming and facilities at Huron Valley, as well as the size of the institution." *Glover I*, 478 F.Supp. at 1092. It was my opinion that the wage disparity would be reduced or eliminated as the programming at HVWF improved according to the relief I granted with respect to educational, vocational and apprenticeship programs. *Id.* It appears that wage discrimination has not been alleviated as of April 1987 because there had been little improvement in the general quality of programming available to the Department's female inmates.

## F. Off-grounds Programming and Work Pass

The use of off-grounds programming as a cost-efficient means of providing rehabilitative opportunities to the female prisoners has been an integral part of this case since its inception. My 1979 Order required the

provision of transportation, consistent with reasonable cost and security considerations, to cooperating educational institutions for eligible inmates who desired to pursue a bachelor's degree. *Glover I,* 478 F.Supp. at 1102. My 1981 Order expanded the availability of off-grounds programming to associate degree candidates seeking to enroll in classes unavailable at HVWF, and to vocational students. *Glover II,* 510 F.Supp. at 1021, 1024. It also set forth the criteria to determine prisoner eligibility for off-grounds programming. *Id.* at 1024. Despite these orders, the Department concedes that off-grounds programming has not been made available to any inmates in any program area. P. Findings at 67–68, #1–6; *cf.* Def. Resp. at 18–19, #1–5.

In 1979, I held that women prisoners were entitled to participate in work pass programs and ordered the State to develop a work pass program for its female inmates comparable to that afforded to its male inmates. *Glover I,* 478 F.Supp. at 1093, 1103. Although there is some evidence that a work pass program existed for women prisoners in the Department's camp system, *see* Miller Dep., Apr. 29, 1986, at 124–25, the Department concedes that as of April 1987 there were no work pass programs at either HVWF or Crane. Def. Resp. at 18, #1–2.

*Conclusion—Part I*

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, I find the following:

A. *Access to the Courts*

1. As of July 1986, the Department was not paying paralegal trainees at the rate of $1.50 per day;

2. The Department failed to provide adequate paralegal training at HVWF between 1979 and 1982 and between 1983 and 1986;

3. The Department did not provide paralegal training to residents of the Florence Crane Facility between April 1985 and April 1987;

4. As of April 1987, there did not exist an adequate pool of trained legal assistants at either HVWF or Crane;

5. Between April 1985 and January 1986, the Department failed to provide a minimally adequate law library at Crane;

6. The failure of the Department to provide prison libraries and paralegal training was part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' fundamental right of access to the courts.

B. *Educational Programming*

(i) Associate's Degree

a. As of April 1987, the Department had not provided its female inmates with a systematic and coherent community college program which, when successfully completed, leads to receipt of an Associate's Degree;

b. The Department had not provided the necessary textbooks as required by my orders;

c. Academic counseling was not made available according to my orders;

d. The failure of the Department to provide post-secondary educational programming was part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

(ii) Baccalaureate Programming

a. The provision by the State of direct financial aid to support baccalaureate programming for male inmates residing at the State Prison of Southern Michigan imposes a reciprocal obligation upon the State to provide comparable assistance to baccalaureate programming for the Department's female inmates;

b. Community colleges were available to provide baccalaureate degree programming if minimum enrollment requirements could be met or Department subsidy obtained;

c. There was sufficient interest on the part of the female inmates in pursuing baccalaureate degree programming;

d. No baccalaureate degree programming was available at HVWF in 1979–1981, 1982, 1984, fall of 1985 and spring of 1986;

e. As of April 1987, no baccalaureate programming was available at the Crane facility in violation of the Department's obligation to its female prisoners as set forth in *Glover I* and *Glover II;*

f. The failure of the Department to provide post-secondary educational programming was part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## C. *Vocational Programming*

1. By April 1987, two of the five HVWF vocational programs existing at the time of my 1979 opinion, building maintenance and general shop, had been eliminated;

2. The ITT program was not intended to, nor did it, serve as a vocational program;

3. No additional vocational programs were added at HVWF between my 1981 Final Order and April 1987;

4. There was no vocational programming at Crane for nearly eighteen months after its opening and only one program, television production, between October 1986 and April 1987;

5. The Department made no effort to arrange continuity of programming at Crane for those transferred from HVWF;

6. The Department failed to implement the programs recommended by Project Grow and failed to take into account the results of the vocational survey in planning vocational programming; .

7. The vocational food service program teaches home economics and does not currently prepare participants for "non-menial" positions in food service;

8. Despite Department policy to the contrary, inmates are often transferred to another institution in the midst of vocational training;

9. The failure of the Department to provide vocational programming was part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## D. *Apprenticeships*

1. As of April 1987, two of the five apprenticeships required by my 1981 Final Order, medical records and dental assistants, were not operational;

2. As of April 1987, there were no apprenticeships at Crane;

3. As of April 1987, the Department had failed to add new apprenticeships at HVWF or Crane;

4. Apprentices in the painting and carpentry programs did not receive the number of hours of related instruction required by the Standard of Apprenticeship compiled by the Huron Valley Women's Facility Multi–Crafts Joint Apprenticeship Committee which was incorporated into, and a part of, my 1981 Final Order;

5. The "on-the-job training" components of the painting and carpentry apprenticeships were often overborne by the construction and maintenance needs of HVWF;

6. The failure of the Department to provide apprenticeships was part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## E. *Prison Industry, Trust Payments and Wages*

1. Prison industry did not begin at Crane until March 1986, nearly ten months after it opened;

2. The final trust payment by the Department for the months of January, February and March 1985 is due and has not been paid;

3. Some of the women prisoners employed in industry between March 1986 and July 1986 were substantially underpaid;

4. Female prisoners were offered less opportunity to work at the highest prisoner wage level than their male counterparts;

5. Wage disparity between female inmates and male inmates persists because the expected improvements in educational, vocational and apprenticeship programs available to the Department's female prisoners have been thwarted by the Department;

6. The failure of the Department to provide prison industries, trust fund payments and prisoner wages in parity with male inmates was part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## F. *Off-grounds and Work Pass*

1. As of April 1987, the Department was not providing off-grounds training to any female prisoner in any program;

2. As of April 1987, there was no work pass program at either HVWF or Crane;

3. The failure of the Department to provide off-grounds and work pass programming was part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## PART II

### Compliance Subsequent to April of 1987

With exception of work pass programming, the evidence reveals little progress

since 1987. Plaintiffs still do not have meaningful access to educational and rehabilitative programs on par with the Department's male inmates.

### A. *Access to the Courts*
#### (i) Paralegal Training
##### (a) *Huron Valley*

The Department has not obeyed my contempt order of June 18, 1985. The contempt order requires the Department to pay paralegal trainees at a rate of $1.50 per day. It also requires the Department to compensate former paralegal trainees for the difference between the rate they received and $1.50 per day. In the event that the Department is unable to locate trainees who have left the corrections system, the order obliges the Department to deposit the unclaimed sums with the Trust.

Paralegal trainees are still not being paid $1.50 per day; instead, the Department pays the trainees $1.50 per class.[11] Testimony of Miller, Jan. 24, 1989 at 14. Miller also testified that the unclaimed sums were not paid to the Trust. *Id.* at 12–13. The Department offered no evidence to rebut this testimony at trial. Instead, it now offers the affidavit of Thomas Galardi as "Exhibit B" to its closing argument. The Department's attempt to expand the record in its closing argument is entirely improper; I will not consider any new exhibits proposed therein.[12] Thus, the only evidence in the record indicates that the Department has yet to comply with my 1985 contempt order, much less, my original order in *Glover II. See also supra* at 811, 814–815.

My orders require paralegal training to continue at HVWF until such time as a sufficient pool of trained legal assistants is developed. The Department contends that a sufficient pool exists; plaintiffs maintain

11. The proposal by James Wilber, incorporated into my 1981 Final Order, clearly contemplates that the trainees be paid $1.50 per day, five days a week. *See* Wilber, *A Proposal for Paralegal Training at Huron Valley Correctional Facility to be Conducted by Prison Legal Services of Michigan, Inc.* (December 1979) (unpublished manuscript) at 5.

12. I find it curious that after taking the extraordinary step of attempting to introduce exhibits after the close of proofs, that the exhibit proffered is a simple affidavit. At a minimum, I would have thought the Department would also include a copy of the "standardized memorandum" Galardi swears was sent and a list of the persons paid.

the opposite.[13] The evidence supports the plaintiffs.

Tekla Miller, Warden at HVWF, testified that ten prisoners who have received some paralegal training are residing presently at HVWF. Testimony of Miller, Jan. 24, 1989 at 10. The Department maintains that these ten prisoners form an adequate pool. I need not decide whether ten trained paralegals are sufficient for a prisoner population of over four hundred inmates [14] because I conclude that there are far fewer than ten trained paralegals at HVWF.

Miller's testimony was based entirely on a list of names provided to her that morning by the Department's Assistant Deputy Director of Programs. *Id.* Miller admitted on cross-examination that she did not know who in fact prepared the list and that she had no personal knowledge of whether the persons named in the list were in fact writ writers at HVWF. *Id.* at 17. From the colloquy between Miller and plaintiffs' counsel, it appears that the list was originally prepared in 1985 and then updated in 1987. At minimum the list is over a year old. Moreover, the list was never admitted into evidence.[15] Miller also admitted that she did not know whether any of ten listed persons had completed their paralegal training. I find that Miller's testimony deserves little weight.

Miller's testimony is contradicted by Mary Glover, an inmate paralegal residing at HVWF at the time of her testimony.

Glover testified unequivocally that she and, perhaps, one other inmate were the only practicing paralegals at HVWF. Glover, Jan. 19, 1989, at 40, 45. Two trained paralegals do not amount to a pool of writ writers. More important, it appears that both of these paralegals no longer reside at HVWF. Glover testified that the other paralegal, Delores Atkins, left HVWF in December 1988. *Id.* at 40. Glover was transferred to Crane, against her will, in the midst of the January 1989 hearings. *See* Tr. Jan. 19, 1989, 1–92. It is manifest that there does not exist an adequate pool of trained legal assistants at HVWF; accordingly, paralegal training must continue at HVWF, not merely by the Department's grace but because my orders require it.

(b) *Crane*

The Department has not offered paralegal training at Crane or the Crane Annex [16] at any time. The Department contends that it need not provide paralegal training at Crane, or the Crane Annex, because each has the requisite pool of trained legal assistants. The evidence does not support the Department's contention.

The Department's assertion is based on its Exhibit 85. Exhibit 85 purports to be a list of eleven inmate paralegals at Crane as of January 21, 1989. Again, I need not decide whether eleven trained inmates are sufficient for an inmate population of close to seven hundred [17] because I find that

---

**13.** Despite the assertion that it is no longer required to provide paralegal training at HVWF, the Department represents that it "has no intention" of terminating paralegal training there as long as eligible and interested inmates are available. Defendants' Closing Argument at 6. While I have no quarrel with the Department's present intent, the Department's intentions can, and have, changed in the past. Therefore, I set forth my own findings.

**14.** *See* Miller, Jan. 24, 1989 at 10.

**15.** At my suggestion, plaintiffs' counsel had Miller's list marked as their exhibit 46 for purposes of identification. The court reporter's notation in the transcript indicates that plaintiffs' exhibit 46 was received into evidence. *See* Tr. Jan. 24, 1989 at 16.

I did not admit plaintiffs' exhibit 46 at the time it was marked. There is no indication in the record that I admitted plaintiffs' exhibit 46

thereafter. My handwritten bench notes, and those of my law clerk, are in accord that the exhibit was neither offered for admission nor admitted. It appears that the court reporter, William Rittinger, did not appreciate the distinction between marking an exhibit for purposes of identification and admitting it into evidence.

**16.** The Crane Annex began housing female inmates in the winter of 1987. Testimony of Alice Pierce, Jan. 27, 1989 at 6. For a discussion of the opening and operation of the Crane Annex, *see* Defendants' Closing Argument at 4, n. 2, I will refer to the main Crane facility as "Crane" and the Crane Annex as "Crane Annex".

**17.** Testimony of Carol Howes, Jan. 24, 1989 at 21.

there are far fewer than eleven inmate paralegals currently residing at Crane and the Crane Annex.

Exhibit 85 is unreliable. The list was prepared at the direction of counsel for purposes of this lawsuit. Testimony of Carol Howes, Jan. 24, 1989 at 23–24. Exhibit 85 is itself nothing more than a list of names; it does not indicate the type of training received by the listed persons, whether they completed paralegal training, or whether they are actually acting as writ writers or paralegals. Carol Howes, the witness used to lay the foundation for Exhibit 85, did not prepare the list herself; also, she had no personal knowledge of any of the facts for which Exhibit 85 was offered. *See* Howes, Jan. 24, 1989 at 22–25. Moreover, Howes' testimony was contradicted by Susan Fair and Anita Alcorta, inmate paralegals residing at Crane and Crane Annex, respectively, at the time of their testimony.

At the time of her testimony, Susan Fair was employed as a clerk in the law library. Stephen Kistler, the law librarian employed by the Department, indicated that Fair was a highly knowledgeable and helpful assistant. Testimony of Stephen Kistler, Jan. 23, 1989 at 76–77. Fair worked at the library every day it was open for six hours a day. Fair, Jan. 24, 1989 at 149. Fair testified that she has been actively involved, as a writ writer, in most of the lawsuits pertaining to Crane that are pending against the Department. *Id.* at 148. Thus, Fair was in a position to know of the activities of the other writ writers at Crane.

Under questioning by plaintiffs' attorney, Fair went through each of the names listed in the Department's Exhibit 85 describing the paralegal training and activities of each inmate. According to Fair, the only writ writers at Crane were herself, Serena Gordon and Joyce Dixon. *Id.* at 148–53. The latter two are employed by Prison Legal Services and may not help to bring suits against the Department. Therefore, they do no writ writing outside their PLS work. *Id.* at 149–50.

Fair testified that she has not seen Maggie Pugh, Cordelius Brown, or Doris Duncan at the law library in several months. *Id.* 149–50. Although possible, it is unlikely that these inmates could practice writ writing without regularly spending time in the library. Fair stated that Pam Schirir does write inmate administrative grievances, but that she does no writ writing. Fair testified that Mary Butler completed her paralegal training before her release on a writ of habeas corpus. At the time of trial, Butler had just been returned to Crane and Fair did not know whether she would practice as a writ writer.

Anita Alcorta testified that she is the only writ writer at the Crane Annex. Testimony of Anita Alcorta, Jan. 24, 1989 at 119. Lyvonda Hopkins is the only other resident of the Crane Annex listed on Exhibit 85. Alcorta testified that Hopkins did not practice writ writing but served only as a notary in the Crane Annex law library.

There are only four active writ writers at Crane, including Schirir and Butler. Susan Fair cannot be counted because she presently resides at Camp Gillman. Two of these four, Serena Gordon and Joyce Dixon, do not participate, by virtue of employment with PLS, in suits against the Department. At Crane Annex there is presently only one writ writer, Anita Alcorta. An adequate pool of writ writers does not exist at either Crane or Crane Annex. Therefore, the Department must commence paralegal training at Crane and Crane Annex.

Plaintiffs also complain that the collections at the Crane and Crane Annex library do not pass muster under *Bounds, id.* at 814. The testimony of Kistler and Fair indicates that both the Crane and Crane Annex libraries presently meet the *Bounds* criteria. I note that the Department's compliance in this respect is late in coming. Both Kistler and Fair stated that needed pocket parts and replacement volumes—missing for an unknown, possibly lengthy, period of time—were placed on order only days before the January hearings. Kistler admitted that the replacement order was motivated by the pendency of the hearings.

Their testimony provides another example of the difficulty I encounter when trying to enforce my orders through traditional exercise of judicial power. My orders are ignored until a hearing date is set; the Department then embarks on a whirlwind of activity directed towards achieving a semblance of compliance. In court, the Department is all promises—compliance is always just around the corner: the pocket parts for the library are on order and will be in place shortly; new educational, vocational, and apprenticeship programs are about to be offered. When I stay my hand, the Department invariably defaults on its promises. The Department is interested in compliance only when it knows that it will have to answer to this court. This is why I conclude the watchful eye of a monitor is necessary to provide impetus for the Department to obey.

(ii) Prison Legal Services

In *Glover I*, I ordered the Department to continue providing Prison Legal Services to its female inmates. After my order, PLS continued to function at HVWF, which was the only women's prison in Michigan at that time. In April 1985 the Crane facility opened. PLS expanded its services to Crane. Plaintiffs complain that the Department has failed to obey my orders regarding PLS because PLS has not been expanded to the Crane Annex or to Camp Gillman where female prisoners now reside. *See* Plaintiffs' Brief and Closing Argument in Support of Contempt and in Response to the Sixth Circuit Remand, Appendix A at 3, # 6.[18]

In April 1989 plaintiffs brought a motion, separate from these contempt proceedings, "For Entry of Judgment to Enforce Order" (April 1989 motion). The motion was prompted by the decision of the PLS Board of Directors to eliminate one staff attorney due to budgetary constraints. The staffing cut led PLS to reduce its services for the female prisoners to ten hours per week. Plaintiffs pray that I order the Department to provide the funds necessary to restore PLS staffing to its former strength. I decline to reach the merits of plaintiffs' complaints with respect to PLS because the issues raised will be controlled by the decision of the United States Court of Appeals for the Sixth Circuit on the appeal from *Hadix v. Johnson*, 694 F.Supp. 259 (E.D. Mich.1988) (Feikens, J.).

In *Hadix*, I held that provision of an adequate law library did not itself satisfy the Department's constitutional duty to provide inmates access to the courts. Particularly with respect to illiterate, indigent, or segregated prisoners, I determined that the least intrusive means for the Department to satisfy its constitutional duty was the provision of PLS. In *Hadix*, I set forth the minimum characteristic of the services to be provided by PLS. By its terms, *Hadix* applies only to the Central Complex of SPSM. *Hadix*, however, will apply perforce to all inmates in the custody of the Department, male or female. Plaintiffs and the Department have admitted this much. Tr. Jan. 19, 1989 at 105–06. Therefore, I will hold plaintiffs' April 1989 motion under advisement pending the decision of the Court of Appeals in *Hadix*. Plaintiffs' Motion to Certify a Question to the Court of Appeals is DISMISSED without prejudice.[19]

B. *Educational Programming*

In educational programming, as in paralegal training, the Department still refuses to implement my orders. My 1981 Order encompassed both the Associate and Bachelor's Degree Programs. I required the Department to implement a "systematic and coherent course package which, when successfully completed, culminates in the

---

**18.** Plaintiffs also raise numerous complaints concerning conditions at Camp Gillman. They complain particularly that Camp Gillman has no law library. Given the camp's unique purposes and conditions of operation, plaintiffs' challenges to the camp program are beyond the scope of this Opinion. I express no opinion on the merits of plaintiffs' complaints.

**19.** At the hearing on the April 1989 motion, I suggested that plaintiffs bring a motion to certify to the United States Court of Appeals for the Sixth Circuit the question of whether the stay of judgment issued in *Hadix* applies to the matters raised in plaintiffs' April 1989 motion. In light of my disposition of that motion, plaintiffs' motion to certify is dismissed.

receipt of an associate's degree." *Glover II*, 510 F.Supp. at 1021. While associate's degree programs have improved at HVWF and Crane, the Department has still not fully met its obligation to provide meaningful associate's degree programming.

With regard to baccalaureate degree programming, *Glover II* requires that the "assistance rendered" by the State to its female inmates be "in no way less" than the assistance rendered to its male prisoners. Since 1984 the State has been funding baccalaureate training for its male prisoners at SPSM through direct grants to Spring Arbor College. Recognizing that support of the bachelor's degree program at SPSM required concomitant support of a bachelor's degree program for the Department's female prisoners, the Department arranged for bachelor's degree courses to be offered at HVWF. Asserting that my orders did not apply to Crane and Crane Annex, the Department did not arrange for bachelor's degree courses to be taught there. Any doubt that my orders apply to Crane and Crane Annex has since been eliminated. *See Glover III*, 855 F.2d at 281. Still there are no baccalaureate courses at Crane.

### (i) Associate's Degree

Kellogg Community College ("KCC") has offered associate's degree programming in business management at Crane since the fall of 1985. *See* Testimony of Alice Pierce, Jan. 23, 1989 at 109. KCC later expanded its programming to include Crane Annex. Jackson Community College ("JCC") has provided an associate's degree course in paralegal studies at HVWF since January 1987. Testimony of Paul Wreford, Jan. 23, 1989 at 93. These are the only associate's degree programs available to women prisoners.

There is evidence indicating that the Department has not yet achieved "systematic and coherent" associate's degree programming. Like Letitia Crawford, *see supra* at 816–817. Serena Gordon testified she has accumulated over eighty credits, but is unable to obtain an associate's degree in any field, much less her field of choice. Testimony of Serena Gordon, Jan. 24, 1989 at 140–45; *see also* Pierce, Jan. 27, 1989 at 16–18.

The ability to earn a degree is diminished not only by the limited choice of fields and course selection but by the inordinate time it takes to complete the program. Inmates at SPSM can complete an associate's degree in four semesters; yet, Alice Pierce estimates that a minimum of seven to eight semesters is required at Crane. Wreford, Jan. 23, 1989 at 94–95; testimony of Pierce, Jan. 23, 1989 at 113. Paul Wreford testified that it takes six to seven semesters to complete the paralegal program offered at HVWF. Wreford, *id.* at 94. Even these minimum estimates have been overly optimistic. By January 1989, KCC had been operating at Crane for twelve semesters and yet no one had graduated from its program. Pierce, *id.* at 114 (first two graduates expected spring 1989). Similarly, JCC has operated at HVWF for at least eight semesters but no evidence was introduced to indicate that there have been graduates. Moreover, the scarce number of course offerings means that most of the more advanced students cannot carry the twelve credits necessary to earn pay for attending college courses. The unavailability of pay discourages inmates from completing their education. Testimony of Tom Goretzka, Jan. 24, 1989, at 46–48.

In contrast, prisoners at SPSM may earn associate's degrees in four separate fields: business marketing, business management, dental technology, landscaping and horticulture. Wreford, Jan. 23, 1989 at 100. JCC has been offering associate's degree programming at SPSM since 1968. In addition to SPSM, JCC also provides associate's degree programming at Egler Correctional Facility and Cotton Correctional Facility. Between seven and eight hundred male prisoners enroll each year in the JCC associate's degree programs. An average of seventy-five male prisoners graduate from JCC each year. *Id.* at 90–95. In addition to JCC, Lake Superior State University ("LSSU") provides associate's degree programming for the Kinross and Hiawatha correctional facilities. Goretzka, Jan. 24, 1989 at 34–35.

The Department maintains that it has had little control over the funding and provision of associate's degree programming and thus should not be held to account for the dearth of educational opportunity available to women inmates. Defendants' Closing Argument at 48–54. I cannot agree.

There are a number of areas in which the Department exercises direct control but where needed improvements have not occurred. For instance, Pierce testified that KCC would offer eight rather than its present four classes at Crane Annex if there were enough classroom space. Pierce, Jan. 27, 1989 at 9. The Department has done nothing to address the shortage of space at Crane Annex. The Crane facility is only a few hundred yards from Crane Annex, yet Annex inmates are not permitted to take courses at Crane. Nor are Crane inmates permitted to attend at the Annex. Testimony of Timothy Hogan, Jan. 20, 1989 at 87, 90. Similarly, the Department has not arranged for off-grounds classes, nor has it investigated the cost of providing to its female prisoners the same programming now available to the male inmates. Wreford, Jan. 23, 1989 at 104.

The Department observes correctly that in the past it has not controlled the funding for the educational programming. Instead, State aid was provided directly to the colleges by appropriation in the State budget.

During the 1970's the colleges received direct grants from the State to serve students. The funding formula was "enrollment driven," meaning that the colleges received additional funds for each student served. Testimony of Ronald Lee Root, Apr. 11, 1989 at 40–41. A new formula took effect beginning in 1984–1985. Under the new formula, the colleges received a fixed amount each year regardless of growth or decline in enrollment. College administrators became indifferent to increasing enrollment. In fact, decreasing enrollment became an attractive means of elimination of budgetary shortfalls. *Id.* at 41–42.

As a consequence of the changed funding formula, Pell Grants became increasingly important as a source of funding for prisoner education. Under the 1970's funding formula there was no incentive to apply for Pell Grants. As a result, Michigan did not take full advantage of available federal dollars. The new formula was imposed partly to encourage the colleges to require their students to apply for Pell Grants. Under the new formula Pell Grants became a principal source of tuition funds for prison programming. *Id.* at 48.

The effect of the new funding method was to eliminate the financial incentive for colleges to provide services to the smaller state prisons. Courses were not financially attractive unless a minimum number of students, usually ten, enrolled. As a consequence, the colleges were eager to service the male institutions, housing large populations of potential students, but not the female prisons with their relatively small potential enrollment.

Perhaps the Department did not create the governing economic environment, but it cannot escape its responsibility under the Constitution. The State of Michigan is providing associate's degree programming for its male prisoners; therefore, it must provide comparable programming for its female prisoners.

The Department argues that the new system of financing prisoner educational programs established in Public Act 324 (1988) satisfies its duty. I do not agree. Act 324 places control over the funding of prisoner educational programs in the hands of the Department. It provides a total of four million dollars to be allocated by the Department on the basis of $3.25 per contact hour. 1988 Mich.Legis.Serv. 1087–88 (West). The Department maintains that the formula provided in the statute assures parity because per capita expenditure, $3.25 per contact hour, is the same regardless of the inmate's sex. The difficulty is that the new method of funding will only continue, if not increase, the college's incentive to provide education to the male prisoners and to eschew the female prisoners. The fact that the colleges may be paid the same regardless of a prisoner's sex does not assure minimally adequate programming for the female prisoners. In

fact, the relatively small amount of money allocated for educational programming as a whole suggests that the amount available to the female prisoners will not suffice. *See* Goretzka, Jan. 24, 1989 at 36–37.[19a.]

The Department contends that it should not be required to "subsidize" educational programming for its women prisoners. It maintains that the disparity in programming between the male and female inmates does not result from any act by the Department or the State, but from the fact that the colleges find providing education to the male prisoners, but not the female prisoners, financially attractive. Defendants' Closing Argument at 53. Yet, the State subsidizes post-secondary educational programming for its male prisoners when such programming is not financially viable.

Act 324 provides separate appropriations of $319,000 and $235,800 for the Marquette and Kinross correctional facilities, respectively. 1988 Mich.Leg.Serv. 1088 (West).[19b.] Thomas Goretzka, educational consultant to the Department and a member of the PREP committee established pursuant to Act 324, testified that Marquette and Kinross received special appropriations because "there aren't enough community colleges in the area." Goretzka, Jan. 24, 1989 at 34. In other words, these special appro-

priations were necessary because otherwise associate's degree programming would not be financially viable at Marquette and Kinross.[20] If the State sees fit to provide supplemental appropriations to compensate for the peculiar circumstances associated with housing male prisoners in the Upper Penninsula, there is no reason why it should not also provide supplemental appropriations to compensate for the special difficulties engendered by the small size of the female prison population.

### (ii) Baccalaureate Degree

The Department's intransigence with respect to baccalaureate degree programming continues. There are still no three- and four-year courses at Crane or Crane Annex. Nonetheless, the State continues to finance baccalaureate degree courses for prisoners housed at SPSM. *See* 1988 Mich. Legis.Serv. 1096 (West) (Public Act 325 appropriates $135,300 during fiscal 1988–89 to SAC for the provision of programming at SPSM). The Department maintains that it need only offer third- and fourth-year classes at HVWF because it has already achieved parity of per capita expenditure and because the $135,300 appropriation to Spring Arbor is part of the Department of Education Budget over which the Department of Corrections has no control.[20a.]

**19a.** Although Act 324 appropriates four million dollars for prisoner educational programming, only two million dollars were actually made available. Apparently two million dollars were subsequently "taken back" by either the legislature or the State Department of Management and Budget. Goretzka, Apr. 17, 1989 at 45–46.

**19b.** Marquette and Kinross have received separate line item appropriations for the provision of associate's degree and vocational programming since 1983. *See* D.Ex. 107. Northern Michigan University ("NMU"), which serves Marquette Prison, ceased offering associate's degree courses at Marquette in 1986 and now offers only vocational programs.

**20.** Act 324 does provide that the moneys appropriated for post-secondary education at Marquette and Kinross be allocated on the basis of $3.25 per contact hour. Nonetheless, neither NMU nor LSSU, the universities serving Marquette and Kinross, is required to compete with other Michigan colleges for a share of money allocated under Section 901(a) of Act 324. In essence these institutions are guaranteed a specified return for their services. The inference I

draw is that these institutions, like so many of the institutions that have declined to serve the female inmates, were unwilling to provide service to Marquette and Kinross without a guaranteed return. The difference between NMU and LSSU and the colleges serving the women is that the former were made the guarantee.

The Department would have me believe that the reason for the separate line item appropriations to Marquette and Kinross was that neither NMU nor LSSU was eligible for funding under the community college appropriations act. Act 324, however, makes clear that "participation in this program is open to both 2–year and 4–year public and private educational institutions." 1988 Mich.Legis.Serv. 1087 (West). Even if the Department's contention is correct, the separate line item allocations still represent the decision of the legislature to subsidize male prisoner education that the State's educational community would not otherwise provide.

**20a.** As the Department itself has recognized, my order in *Glover I* "does not speak in terms of the Department of Corrections, or even the Director, but rather in terms of activities of the

Moreover, it alleges that participation by male inmates in four-year programming has declined; now only twenty male inmates receive baccalaureate degrees each year rather than forty.

I hold that the Department has not met its obligations to the female prisoners even if it is assumed that the Department has achieved parity of per capita expenditure. I do not agree with the Department that *Glover III* defines parity purely in terms of per capita expenditure. Defendants' Closing Argument at 54. The opinion of the Court of Appeals "suggests" that I consider per capita expenditure as one of many factors in determining "what 'parity' is." *Glover III*, 855 F.2d at 288. Judge Engel wrote separately to emphasize that "evidence of comparable per capita expenditure is not an end in itself." *Id.*

Equal per capita expenditure does not assure parity of educational opportunity for the female inmates. It does not change the fact that male inmates at SPSM may earn bachelor's degrees in three separate fields, arts, behavioral science and criminal justice; whereas women inmates at HVWF may earn only one degree in general studies. It does not change the fact that an average of forty SPSM inmates have received bachelor's degrees each year since 1979. By contrast, HVWF was scheduled to graduate its first bachelor's degree candidates in May 1989. Ronald Lee Root, director of higher education management services of the Michigan Department of Education and the Department's own witness, explains why per capita expenditure cannot be a true measure of parity.

The data already introduced [at the January and April 1989 hearings] indicates that it would be difficult to draw any analogy between the expenditures per capita and quality or parity of educational program in this state. The data clearly indicates we have some community colleges in the state that ... expend two or three times as much per student in some communities as they do in oth-

ers. To presume that the quantity is three times as good in those communities is ridiculous. ... So the order suggesting that the remedy be equal expenditures per women inmate as per male inmate what average do we use? It varies all over the map. I would think that the better remedy would be to try to have parity of programming. ...

Root, Apr. 11, 1989 at 72–73.

The Department's female prisoners have not yet achieved parity in baccalaureate degree programming.

## C. *Vocational Programming*

Plaintiffs have not realized equality of opportunity in vocational training. While the women have available a few more programs than they had in April 1987, many of these programs function poorly. The Department's male prisoners still enjoy a greater variety of programming options. The Department's belabored explanation of its inability to support female vocational training at a level comparable to its male prisoners cannot overcome the basic fact that parity has not been achieved.

There are now five vocational programs at HVWF: office occupations, graphic arts, and food service (the three programs existing in 1987) remain; institutional custodial maintenance, and horticulture programs were added in October of 1987. At Crane there are now three programs: television production, office occupations, and horticulture. The horticulture program commenced in 1987 and the office occupations program began in February 1988. At Crane Annex there are now two programs: office occupations and food service which commenced in May 1988 and January 1989, respectively.

The Department represents that its female prisoners now have available training in seven separate vocations, counting a nurse's aide program to be reinstated in the "foreseeable future." It notes the continued existence of the ITT program at HVWF. Citing Exhibit 117B, it observes

---

State. Since the State Legislature has chosen to provide moneys for male-baccalaureate programs, under Judge Feikens' Order, female-bac-

calaureate programs of a comparable nature must be provided...." P.Ex. 34.

that ten percent of all the prisoners involved in vocational programming are female prisoners and that seventeen percent of the vocational classes are taught in women's prisons. In its view, parity has been achieved. *See* Defendants' Closing Argument at 30–31. I do not accept the premise that parity can be proved solely by a "body count" of programs or by statistical comparisons.[21] These may be indicia of equality, but they do not settle the question.

I find that many of the programs said to be available to the female prisoners are inferior in design, execution, or both. For instance, there has been no instructor for the horticulture program at HVWF since October 1988. A substitute teacher, employed only for October and November 1988, was trained in computers and not horticulture. Marshall, Jan. 19, 1989 at 147–48; Testimony of James Howard, Jan. 19, 1989 at 164–65; Testimony of Stacey Barker, Apr. 10, 1989 at 48–53. Inmates in the food service program at Crane Annex do no cooking; they only read books and watch video instructions. Hogan, Jan. 20, 1989 at 54, 80–81. The worst program by far is television production at Crane. Ostensibly, the program teaches marketable skills in television production, script writing, camera work and editing. *Id.* at 76. Under questioning by me, Darlene Edlund, Hogan's predecessor as school principal at Crane, admitted that job prospects of program graduates were dim. Testimony of Darlene Edlund, July 25, 1986 at 338–41. The inmates are also skeptical. Susan Fair aptly sums up the sentiment concerning the television program:

> [T]he TV production studio has a rough time keeping students because even the students themselves think it is a farce. There is no place anybody is going to get a job behind that experience. I mean, Steven Spielberg has not called the prison once to ask for TV production graduates. It is not about to happen.

Fair, Jan. 24, 1989 at 166.

Whereas the television production program carries virtually no hope of post-graduation placement, the food service, horticulture, and institutional maintenance programs offer hope of only menial, or near meanial, employment. Graduates of the Crane food service program can look forward to positions as waitresses, salad bar attendants, and short order cooks starting at minimum wage. Testimony of Daniel Woodward, Jan. 23, 1989 at 45; *see also supra* at 31–32.

Woodward, a vocational consultant to the Department, could not identify any above-minimum wage jobs that would be available to participants in the horticulture program. *Id.* at 49. Similarly, he testified that participants in the Institutional Custodial Maintenance program would also start at minimum wage. *Id.* at 51. The Department can quibble about whether or not minimum wage jobs are menial,[22] but there

21. My reluctance to rely on statistical presentations, particularly based on the extrapolations of counsel, is borne out by examination of Exhibit 117B. First, Exhibit 117B presents data as of January 1988, not 1989 as the Department maintains. Second, the Department's counsel states that "approximately ten percent" of the prisoners enrolled in vocational programming are female. Defendants' Closing Argument at 30. The actual percentage, derived from the data presented in Exhibit 117B, is 6.2% (245/1624), close to one-half of counsel's "approximation." Third, it is not clear what these "statistics" prove. For instance, the Department regards it as significant that seventeen percent of the total number of classes offered during 1988–89 were given in women's facilities. *Id.* By the Department's method of calculation, fourteen percent of the classes offered during 1987–88 were given at female institutions. Does this mean that the plaintiffs were three percent closer to parity during 1988–89 than during 1987–88? Can it truthfully be said that there is presently parity of programming between the men and women when the latter have only seventeen percent of what is offered the former? Clearly, the concept of parity is far too elusive to be captured fully by the Department's simple mathematics.

22. The Department insists that job opportunities available to women prisoners cannot be characterized as menial because menial "pertains to the household, and describes servile and low tasks." Defendants' Closing Argument at 31, n. 12. It states that at the time of the original trial in this case "the courses offered women, in contrast to those available to men, were not designed to lead to income producing skills, but rather to train the women to run their own household upon release." *Id.* Thus, the Depart-

can be no doubt that parity of opportunity with the male inmates does not exist; Woodward testified that upon release participants in the male vocational programs can expect to start jobs at above minimum wage. *Id.* at 44.

Woodward states that the male prisoners have the potential to participate in vocational programs such as auto body repair, auto mechanics, building trades, mechanical drafting, electronics, machine tool and die, optical technology, small engine repair, welding, warehousing and distributing, meat cutting, and machine millwright. *Id.;* *see* Woodward, Jan. 19, 1989 at 108; P.Ex. 20, App. B. The Department's male prisoners are exposed to highly skilled, potentially high-paying trades; its women prisoners are offered training in unskilled, low-paying fields. (For an example of the programming available to the male prisoners, *see* Woodward, Jan. 23, 1989 at 11–12, describing how male prisoners are first taught basic drafting and then progress to computer aided design.)

The Department argues that the discrepancy is due to its focus on the abundance of jobs available in the fields offered to the women prisoners as contrasted with the more competitive fields that the men are trained to enter. *See id.* at 45. There are also other explanations. The Department concluded that a program in electronics would not be sustainable at the women's prisons in light of the difficulty experienced in recruiting male inmates with suffi-

cient mathematical skills.[22.a.] Woodward, Jan. 20, 1989 at 112. It also contends that the demand for the products of the graphic arts and optical programs was not sufficient to justify expansion to the women's prisons. *Id.* at 113–15.

Other excuses are less compelling. The primary reason why the auto mechanics course is not offered to the women at all is because the program is too capital intensive. Similarly, cost is the primary reason why the Department does not offer food services, office occupations, institutional maintenance and health care at each of the women's prisons despite the abundance of jobs available in these fields. Woodward, Jan. 23, 1989 at 19. Moreover, the Department did not offer convincing reasons why men are offered training in drafting and machine tooling and the women are not. *Id.* at 11, 14–15.

It may be that some of the programs presently available to the men are now more competitive. For whatever reason, the Department continues to offer men training in these highly skilled, but perhaps more competitive, trades. Lurking behind the decision not to offer these programs to the women prisoners is dated paternalism: women cannot survive in a competitive market and thus need to set their sights on menial but abundant jobs. There may exist valid reasons for not offering women prisoners some of the programs currently offered the men. Nonetheless, the women are entitled to participate in at least some training in highly skilled fields when that

ment suggests that today's vocational programming offers hope of non-menial employment because the training no longer pertains exclusively to the household. It may be that the Department has moved the women out of the home and into the marketplace but, as Woodward testified, they have not been trained to obtain financial independence. Apparently the Department is satisfied to impose this state of economic limbo on its female, but not its male, prisoners.

**22a.** The Department maintains that it would be pointless to start an electronics course at either HVWF or Crane when sufficiently skilled students could not be recruited at the much larger men's prisons. Yet, this assertion is contradicted by the Department's actions.

The Department added a vocational electronics program during 1987 at Muskegon Temporary Facility ("MTF"). MTF's rated capacity, 640 prisoners, is only slightly greater than that of the Crane facility (500 prisoners). P.Ex. 99 at 59; *see also id.* at Appendix A. It is rather odd that the Department would place a program at a new facility that it claims is failing at others. More important, if 640 inmates will support an electronics vocational program at MTF, it is likely that such a program could also be viable at Crane.

It is also curious that vocational programming in auto mechanics and appliance repair, fields that the Department claims to be de-emphasizing because job competition is too fierce, was placed in the Western Wayne Correctional Facility when that facility opened in 1985.

opportunity is offered to the male prisoners.[23]

### D. *Apprenticeships*

At present, as in 1987, the Standards of Apprenticeship (incorporated in *Glover II*) are not being followed. In fact, only two of the five apprenticeships set forth in the Standards are now operational; three of the five programs were operating in 1987. In *Glover I*, I found that the Department's female prisoners were entitled to participate in apprenticeship programming. In *Glover II*, I incorporated a plan, agreed to by the parties, to implement the required apprenticeships. Today, more than ten years later, the women are still not offered participation in meaningful apprenticeships.

In 1981, I ordered the Department to implement five apprenticeships: Medical Records, Building Maintenance, Dental Assistance, Painting and Carpentry. In 1987, only the dental, painting, and carpentry apprenticeships were operational. The dental program has since ceased operation and the Department has announced that the carpentry program will be terminated. There remains only one apprentice indentured in carpentry. Those who have sought entry into the carpentry program have been turned down. The building maintenance apprenticeship, however, has been re-established. Thus, only two of the programs I ordered in *Glover II* will continue to operate. The Department has not sought a modification of my order in *Glover II* nor is there any indication that it has followed the procedure for amending the Standards set forth therein. *See* P.Ex. 9 at 7.

Plaintiffs ask that I find the Department in contempt on these facts alone. To my mind, however, the issue is not so much whether the Department has obeyed my orders, which it clearly has not, but whether the result that I sought to accomplish through those orders—establishment of meaningful apprenticeships—has been achieved.

As was true in 1987, the apprentices are not receiving adequate academic instruction. As of April 1989, the landscaping apprenticeship, like vocational horticulture, had no teacher and was not operational. Marshall, Jan. 19, 1989 at 147–48; Barker, Apr. 10, 1989 at 48–54; *cf.* Howard, Jan. 19, 1989 at 172 (one inmate "indentured" to the landscaping apprenticeship under the tutelage of the grounds maintenance supervisor and also the special education teacher).[24] Similarly, there was no one to give related academic instruction to the building maintenance apprentices at Crane. Instead, the apprentices are given texts to read on their own. Tests were to be graded by mail. During the course of her apprenticeship, Linda Spragner wrote fourteen tests; not one was graded because the Crane school principal neglected to mail them in for correction. Despite the uncorrected tests, Spragner received a Certificate of Completion for the building maintenance program. Hogan, Jan. 20, 1989 at 97–99; Testimony of Linda Spragner, Jan. 24, 1989 at 99–103.

There is evidence that academic instruction has been sporadic in the HVWF building maintenance apprenticeship. Testimony of Antoinette Love, Jan. 24, 1989 at 74–80. Linda Greene, the remaining carpentry apprentice, testified that she exhausted her sole academic text in August 1988, and had not since had academic instruction related to her apprenticeship. Greene, Jan. 24, 1989, at 117. Finally, the

---

**23.** I do not wish to be understood as suggesting that the Department discontinue any existing programs. Rather, the Department should work to improve these programs so that they provide opportunity for non-menial employment.

**24.** Appended to the Department's closing argument is an affidavit sworn by James Howard, school principal at HVWF. In it, Howard avers that the Department contracted with JCC to teach the landscaping apprenticeship and that classes began on the last day of May 1989. Plaintiffs quite properly observe that there is still no evidence in the record indicating that there is an instructor for the landscaping program. Although plaintiffs have not expressly challenged the veracity of Howard's statement, I cannot accept it, particularly in light of the Department's abysmal record in apprenticeships.

painting apprentices have not worked with a journeyman painter on a regular basis, as required by the Standards. Instead, they received "periodic" supervision from their craft supervisor. Most of the time they paint on their own without supervision by anybody but a prison guard. Howard, Jan. 19, 1989 at 169; Testimony of Margaret Neal, Jan. 24, 1989 at 88.

I agree with plaintiffs that my apprenticeship orders have not been obeyed; the women inmates have neither the quantity nor the quality of apprenticeships that I ordered. The Department's approach to my apprenticeship orders, indeed all the orders in this case, has been to do as little as possible; they strive for the appearance, but not the reality, of compliance.

### E. *Prison Industry and Wages*

The Department asserts that it is in full compliance with my orders regarding prison industry and wages and ask that I "dissolve" my orders with respect thereto. The evidence does not support the assertion.

The women inmates now have the potential to participate in three prison industries. There are two industries operating at HVWF: manufacture of cushions and license tabs. The industry at Crane is data processing.

Defendants introduced evidence tending to show that the female prisoners have a greater opportunity to participate in prison industry than do the male prisoners. *See* Testimony of Howard W. Gentry, Jan. 20, 1989 at 7–27. On that basis alone, the Department contends that it is in compliance. I cannot agree.

While the female prisoners may have greater opportunity to participate in prison industry, the nature of the work they perform puts them at a disadvantage in terms of wages. Prisoners receive wage classifications based upon their level of skill. Because the women generally enter prison industry without prior experience, they start at the lowest wage classification. With the possible exception of data processing at Crane, prison industry is not linked to the apprenticeships. By contrast, the male prisoners at SPSM have the opportunity to participate in apprenticeships leading to employment in prison industry. *See Glover I,* 478 F.Supp. at 1089. Consequently, the apprentices have greater skills when they begin employment and thus obtain higher wage classifications. The situation is similar with respect to institutional jobs; the women are exposed to lower quality training and as a consequence have fewer skills and are eligible for lower wages. This is why I concluded in 1979 that the unequal opportunity afforded female prisoners was due to the "generally lower quality of programming at Huron Valley, as well as the size of the institution." *Glover I,* 478 F.Supp. at 1092. *See also supra* at 47–48. As in 1987, I have seen no evidence that the quality of programming has improved sufficiently to justify the inference that women now have the opportunity to earn equal wages for comparable work.

### F. *Off-grounds Programming and Work Pass*

In both *Glover I* and *Glover II,* I ordered the Department to make use of off-grounds programming to facilitate provision of educational, vocational, and apprenticeship programs in a cost-efficient manner. As of April 1987 there was no off-grounds programming. The Department introduced no evidence in either the January or April 1989 hearings indicating that off-grounds programming is now available. I conclude that off-grounds programming is still not being offered.

As of April 1987, there were no work pass programs available at HVWF, Crane or Crane Annex. Today, however, there is a work pass program operating out of Crane Annex. More than one hundred inmates participate in community works projects for federal government at Fort Custer, various municipal governments and school systems, private nursing homes and the local chamber of commerce. Testimony of James Lyon, Jan. 20, 1989 at 32–38. I find the progress in work pass encouraging.

*Part II—Conclusion*

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, I find the following:

A. *Access to the Courts*

1. There is not now an adequate pool of trained legal assistants at HVWF;

2. There is not now an adequate pool of trained legal assistants at Crane or Crane Annex;

3. Paralegal training is not offered and has never been available at Crane or Crane Annex;

4. The Crane and Crane Annex law libraries are maintained haphazardly; the collections were raised to constitutional standard only as a result of the pendency of court proceedings;

5. The failure of the Department to provide paralegal training and to maintain the prison libraries adequately is part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' fundamental right to access the courts.

B. *Educational Programming*

(i) Associate's Degree

a. Associate's degree programming is presently provided for male prisoners housed at SPSM. It is also provided at the Egler, Cotton, Kinross and Hiawatha correctional facilities;

b. Each year between seven and eight hundred male inmates enroll in associate's degree classes offered by Jackson Community College. Each year an average of seventy-five male inmates graduate from the JCC program;

c. The Department does not now provide its female inmates with a systematic and coherent community college program which, when successfully completed, leads to receipt of an associate's degree;

d. The funding mechanism for Michigan's community colleges during the 1980's reduced the incentive for the colleges to serve female prisoners;

e. The implementation of Act 324 during fiscal year 1988–89 will not change existing financial incentives;

f. The failure of the Department to provide post-secondary educational programming to its female inmates is part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

(ii) Baccalaureate Programming

a. The provision by the State of direct financial aid to support baccalaureate programming for male inmates residing at the State Prison of Southern Michigan imposes a reciprocal obligation upon the State/Department to provide comparable assistance to the Department's female inmates for baccalaureate programming.

b. The State continues to provide financial assistance to Spring Arbor College for the purpose of providing three- and four-year degree programming for male inmates housed at SPSM.

c. An average of twenty male inmates housed at SPSM graduate the Spring Arbor program each year.

d. No baccalaureate programming is available at Crane or Crane Annex.

e. The failure of the Department to provide post-secondary educational programming is part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

C. *Vocational Programming*

1. Male inmates presently have the potential to receive vocational training in more than thirteen highly skilled trades which lead to employment at above minimum wage.

2. Female inmates have the potential to receive vocational training in six different trades: office occupations, graphic arts, food service, institutional custodial mainte-

nance, horticulture and television production.

3. There are still fewer vocational programs at HVWF than required by my 1979 Order. *See Glover I,* 478 F.Supp. at 1087 (women prisoners entitled to a greater variety of programming than provided by the five existing programs).

4. The vocational training opportunity provided to the women prisoners leads to menial employment at, or slightly above, minimum wage.

5. The vocational training presently available to the women prisoners is inferior in design, execution or both.

6. The failure of the Department to provide vocational programming is part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

D. *Apprenticeships*

1. The Standards of Apprenticeship incorporated into my 1981 Final Order are not followed.

2. Only two of the five apprenticeships required by my 1981 Final Order are now in operation.

3. Related academic instruction required by the Standards is not provided.

4. Painting apprentices do not receive adequate supervision by journeyman painters as required by the Standards.

5. The failure of the Department to provide apprenticeships is part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

E. *Prison Industry, Trust Payments and Wages*

1. Wage disparity between female inmates and male inmates persists because

the expected improvements in educational, vocational and apprenticeships have been thwarted by the Department.

2. The failure of the Department to provide female inmates with prison industries and prisoner wages in parity with male inmates is part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

F. *Off-grounds Programming and Work Pass*

1. The Department has failed to provide off-grounds programming to any female prisoners in any program at any time.

2. The failure of the Department to provide off-grounds programming is part of a continuing pattern of willful and intentional violations of my orders in this case and of class members' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

PART III

Findings Requested By The
Court of Appeals

A. *History of educational offerings at all Michigan correctional institutions since the court's 1981 "Final Order"*

The history of educational offerings at all Michigan correctional institutions since 1981 is set forth as Appendix B to this Opinion. [Appendix B omitted by the court for purposes of publication.] Appendix B reveals fully the depth and breadth of the Department's commitment to the education of its male prisoners. In comparison, the opportunity available to the women inmates is trifling.[25]

---

**25.** The findings with respect to the history of vocational programming are drawn from D.Ex. 93–99. The remainder of Appendix B consists of a chart prepared by plaintiffs as an attachment to Appendix B of their Closing Argument. The data provided in their chart is supported in most part by the following evidence: D.Ex. 105, 106 (Appendix G—PREP Report), 108, 110–B,

B. *Current state of educational programs at all Michigan correctional institutions*

The current state of educational programs at all Michigan correctional institutions is set forth as Appendix C to this Opinion.[26]

C. *Identity of the public and private colleges and universities now providing educational programs to Michigan prison inmates, and the identity of the specific Michigan correctional facilities in which such programs are being offered*

The identity of the public and private universities now serving Michigan prison inmates and the corresponding prisons served is also set forth in Appendix C to this Opinion. [Appendix C omitted by the court for purposes of publication.] *See also supra* n. 26.

D. *Per capita amount now being expended for two-year and four-year programs for women and for men at such institutions and the source of those funds*

No credible evidence was introduced to show present per capita expenditures, by gender, for two- and four-year educational programs. There is some evidence to indicate the present sources of funding but there is no reliable evidence of the relative contribution made by each source. The expert testimony offered by both parties and the exhibits submitted in conjunction therewith are either incomplete, unreliable, or based on faulty premises. I am unable to make findings with respect to present per capita expenditures.

(i) Per Capita Expenditure

Plaintiffs' expert was Dr. Michael Harry Thompson, Adjunct Assistant Professor of Economics at Wayne State University. Thompson was admitted as an expert on economics and statistics. Tr. Apr. 17, 1989 at 83. Thompson's testimony was devoted primarily to the introduction and explanation of a series of tables and charts prepared by him. These tables and charts were admitted as Plaintiffs' Exhibit 49.

The first table in P.Ex. 49 compares the percentage of male prisoners receiving post-secondary education to the percentage of female prisoners receiving such education. Table 2 presents data concerning the relative economic value of post-secondary education. Table 3 estimates the shortfall suffered by the women because they were not paid wages to attend post-secondary education when men received such pay. The charts come closest to addressing per capita expenditure.

There are seven charts arranged according to fiscal year beginning with 1981–82 and continuing through 1988–89. The charts purport to show the dollar amount of State aid expended per Fiscal Year Equated Student (FYES) for men and women during each of the covered years. Thus, according to Thompson, the average State aid per FYES for prisoner post-secondary programming during fiscal year 1982–83 was $174 for male inmates and $62 for female inmates. *See* Testimony of Dr. Michael Harry Thompson, Apr. 17, 1989 at 100. Using the same measure for each year thereafter, the charts reveal disparate expenditure favoring the male prisoners. The charts do show the gap between expenditure for male and female prisoners

112, 128, 120–25 and P.Ex. 45, 49, and 52; Pierce, Jan. 27, 1989 at 14–15; Goretzka, Apr. 10, 1989 at 36; Root, Apr. 11, 1989 at 45; Wreford, Apr. 26, 1989 at 8–13. Some of the data could not be confirmed by the above-cited evidence. Nonetheless, I adopt plaintiffs' chart because I find it credible. Moreover, the Department has neither offered independent contrary evidence nor objected to plaintiffs' chart.

**26.** Appendix C consists of a chart prepared by plaintiffs as an attachment to Appendix B of their Closing Argument. The data provided in

their chart is supported in most part by the following evidence: D.Ex. 105, 106 (Appendix G—PREP Report), 108, 110–B, 112, 128, 120–25 and P.Ex. 52; Pierce, Jan. 27, 1989 at 14–15; Goretzka, Apr. 10, 1989 at 36; Root, Apr. 11, 1989 at 45; Wreford, Apr. 26, 1989 at 21. Some of the data could not be confirmed by the above-cited evidence. Nonetheless, I adopt plaintiffs' chart because I find it to be credible. Moreover, the Department has neither offered independent contrary evidence nor objected to plaintiffs' chart.

narrowing each year. In fact, the 1987–88 figures offered by Thompson show roughly equal expenditure. However, the 1988–89 charts, compiled from projected expenditures, show the men again outpacing the women. It should be noted that the special appropriations for NMU, LSSU, and Spring Arbor were treated separately in graphs at the bottom of each chart. Thus expenditures for male prisoners are underestimated in the main graph on each chart. *See* P.Ex. 49.

There are several reasons why Thompson's figures cannot be relied upon. The data provided Thompson was compiled on an FYES basis, not according to the number of prisoners receiving education. An FYES is defined as a student taking a full academic load of thirty-one credit hours. Root, Apr. 11, 1989 at 54. For instance, two students taking a half-load equal one FYES. *Id.* Thompson's data does not reveal the actual number of male or female prisoners attending class. Therefore, amounts expended per FYES do not necessarily indicate amounts expended per prisoner.

More important, Thompson's presentation relies on an untested assumption—that State aid is allocated to, and apportioned by, the colleges and universities according to FYES. Thompson assumed that the amount of State aid expended on prisoner programming by a particular college or university could be determined by multiplying the total State aid to that college or university by the ratio of prisoner FYES to total FYES attending the college or university. *See* Thompson, Apr. 18, 1989 at 25–28; *see also* D.Ex. 120–25, particularly D.Ex. 125 at Section I, p. 7 and Section III, p. 39; *cf.* P.Ex. 49, 1982–83 chart.[27] Yet, no evidence was presented to suggest that the colleges actually allocated the money on that basis. *See, e.g.,* Testimony of Janet

Tjepkema, Apr. 11, 1989 at 5–6 (Spring Arbor does not allocate proportionately).

Although Thompson's premise is logical, there are other equally logical assumptions that could be made. For instance, the colleges or universities may well allocate State aid according to the cost of the programs; therefore, a college may expend more or less on prisoner programming in a given year than the proportionate share per FYES would indicate. It is likely that some colleges expend a larger-than-proportionate amount on prisoner programming while others spend less. Even Thompson admits that his method provides only a "broad general measure" of expenditures which should be applied with caution. Thompson, Apr. 18, 1989 at 29; *see also id.* at 40. Without precise information from each college, I cannot determine per capita expenditures by gender, even on a FYES basis.

A second assumption made by Thompson was that he could distinguish expenditures by gender. This premise is false with respect to some of the colleges. The data compiled in D.Ex. 120–25 does not itself distinguish between expenditures for male and female prisoners. Root, Apr. 11, 1989 at 54–58. State aid can generally be classified according to gender by noting the gender of the inmates housed at a particular prison. For instance, KCC serves Crane and Crane Annex only. Crane and Crane Annex house only female prisoners. Therefore, State aid to KCC for prisoner programming can be considered State aid for female prisoner programming. However, JCC and Spring Arbor serve both male and female inmates. There is no evidence in the record indicating the allocation of State aid by gender to these schools. Thompson's charts do make such an allocation for aid to these institutions, *see* P.Ex. 49 (charts for fiscal years 1986–87, 1987–88, and 1988–89). Yet, I cannot determine

---

**27.** Thompson compiled P.Ex. 49 from data supplied in D.Ex. 120–25. Examination of these exhibits reveals Thompson's method. For example, p. 7 of Section I of D.Ex. 125 indicates that Gogebic County Community College ("Gogebic") had a total of 1,184 FYES during fiscal year 1982–83 of which 367 FYES were attributable to prisoner FYES. Thus, prisoners accounted for 31 percent of the FYES at Gogebic. Section III, p. 39 of D.Ex. 125 indicates that Gogebic received $1,783,600 in State aid: $1,783,600 multiplied by .31 equals $522,852.47. P.Ex. 49 lists $552,856 as the amount of State aid allocated to prisoner programming at Gogebic during fiscal year 1982–83.

the basis for these allocations. While Thompson's charts provide some estimate of the relative educational expenditures for male and female prisoners, they do not provide a basis for firm conclusions.

The Department presented the testimony of Dr. Lawrence Stiffman, a private consultant to the Department. Unlike Thompson, Stiffman was not admitted as an expert in either economics or statistics because he lacked the requisite educational background. Instead, he was admitted as a "program analyst." His testimony was limited to "reviewing administrative data and putting it in a format that is more easily understood." Tr. Apr. 18, 1989 at 73–78.

Stiffman's testimony was devoted primarily to the introduction and explanation of D.Ex. 100. D.Ex. 100 is a five-page document. A graph entitled "Distribution of Minimum Sentence Length by Gender" appears on page one. Page two presents a bar graph representing Stiffman's conclusions concerning per capita expenditure by gender for Advanced Basic Education, General Equivalency Degree, Special Education and Vocational programming. Page three consists of two bar graphs purporting to compare per capita expenditures to revenues by gender for post-secondary education over a six-year period. Page four is a table purporting to represent Spring Arbor's per capita expenditures by gender during the 1986–87 and 1987–88 fiscal years. Page five is a series of three tables representing Stiffman's attempt to replicate the information presented in P.Ex. 49, Table 1, using different assumptions.

Per capita expenditure for two- and four-year programming is only addressed on page three. The bar graphs on page three confirm the general conclusion reached by Thompson—during the last six years expenditures on male post-secondary educational programming have outpaced expenditures on female programming by a progressively narrower margin. Page three, however, presents no information on current expenditures.

Moreover, Stiffman's presentation is unreliable. On cross-examination, Stiffman admitted that he overcounted the number of male prisoners, at least for fiscal 1986–88 expenditures. Testimony of Lawrence Stiffman, Apr. 18, 1989 at 108–11. Putting aside Stiffman's computational errors, Stiffman's presentation necessarily suffers from the same defects that inhered in Thompson's because both used the same data base.

In addition, I find it difficult to understand the procedure Stiffman used to reach his conclusions. Under questioning by plaintiffs' counsel, Stiffman explains cryptically that he calculated an average of per capita expenditures from the ratio "total expenditures spent for post-secondary education for each individual year" and "adjusted prison count." *Id.* at 112. After studying the underlying data provided in D.Ex. 121, I remain uncertain as to the number Stiffman ultimately settled upon as "total expenditure" for post-secondary education during fiscal year 1986–87. Similarly, I cannot tell from his testimony whether the "adjusted prison count" is the sum of the male and female populations, or the populations taken separately by gender. In short, Stiffman's page three defies understanding.[28]

---

**28.** There are other reasons, in addition to the misgivings stated above, why I conclude that Stiffman's testimony is generally unreliable. First, Stiffman's educational and professional qualifications are less than one would expect for a project of this complexity. *See* Tr. Apr. 11, 1989 at 73–78. Second, Stiffman's calculations were proven to be riddled with error. *Id.* at 102–08 (Stiffman admits that population figures used for the analysis appearing on page 5 of D.Ex. 100, method 3, are in error as are the population figures used in the analysis appearing on page 3 of D.Ex. 100). One example will suffice to show why I consider Stiffman's testimony generally unreliable. In calculating Annual Per Capita Expenditure by Gender for Spring Arbor, the table appearing on page 4 of D.Ex. 100, Stiffman relied on the margin notes of some unknown individual to conclude that twenty women were enrolled at Spring Arbor during the academic year 1987–88. *See* D.Ex. 128 at 3, 6. Reference to D.Ex. 127 readily establishes that there were in fact only five female students enrolled at Spring Arbor at that time. *Id.* at 2. *See also* Stiffman, Apr. 18, 1989 at 83–85. Stiffman managed to count the same five women four times. On the whole, I find Stiffman's presentation unsatisfying.

In fairness to Thompson and Stiffman I note that the data available to them was in many ways incomplete. For instance, neither the State Department of Education nor Corrections keeps accurate records of the cost of providing prisoner post-secondary education. Information is available as to the cost of educating students generally but there is no sure way to apportion part of that cost to prisoner education. Similarly, neither the Department of Education nor Corrections keeps records by gender. Consequently, both Thompson and Stiffman were forced to estimate the allocation of funds between male and female prisoners. On the basis of these presentations, I can only conclude that the data available does not include the information sought. The evidence offered on present per capita expenditure is more likely to inhibit rather than inform thoughtful consideration of the appropriate remedy in this case.

### (ii) Source of Revenues

Between 1981 and 1987, there were two funding sources for post-secondary prisoner educational programming: (a) general college revenues and (b) State aid specifically designated for prisoner programming.[†]

General college revenues are the largest source of funding for prisoner associate's degree programs. Defendants' Exhibits 120–25 indicate that the sources of community college general revenues can be subdivided into four categories: tuition and fees, local property taxes, State aid, and miscellaneous. Between 1982 and 1986, tuition and fees and local property taxes each accounted for between twenty and thirty percent of the community colleges' total revenues.[29] State aid usually accounts for fifty to sixty percent of total revenues while miscellaneous sources accounted for five to ten percent of total revenues. In Appendix D, I provide the tables from D.Ex. 120–25 which set forth "General Fund Revenue Sources" for Michigan's community colleges between 1982 and 1988. [Appendix D omitted by the court for purposes of publication.] There is not sufficient evidence in the record to determine the portion of total revenues which the colleges applied to their prisoner programs during these years.

Act 324, the statute appropriating funds for the Department during fiscal 1988–89, changed the funding of prisoner post-secondary and vocational education. Previously, State aid for prisoner post-secondary and vocational education was provided indirectly—colleges apportioned some part of the general aid received from the State to prisoner education. Act 324 appropriates funds to the Department to provide direct funding for prisoner programming. Although the State has not reduced general State aid to colleges serving prisoners as a consequence of Act 324, the appropriations Act for the State's community colleges makes clear that no State funds other than those appropriated in Act 324 will be provided for prisoner programming. *See* Mich.Pub.Act 320, 1988 Mich.Legis.Serv. 929, 933 (West). Thus, under Act 324 the Department is the sole source of State aid for prisoner post-secondary education.

It is not clear whether the legislature will continue the funding scheme established in Act 324. As of August 1989, the appropriations Act for the Department has not yet been enacted. There is at least a suggestion in the record that the Act, when passed, will not follow the funding pattern set forth in Act 324. Goretzka, Apr. 17, 1989 at 75. Therefore there exists no evidence of the amount or sources of future State funding for post-secondary prisoner education.

Spring Arbor is presently the only college providing four-year degree programming to Michigan prisoners. Since 1981 Spring Arbor has had three sources of revenue for its prisoner program. From 1981 through 1985, Pell Grants were the single largest revenue source (as a percentage of

---

[†] *But see infra* note 29.

**29.** During the 1980's a significant share of prisoner tuition for post-secondary education was received by the colleges in the form of federal Pell Grants. Apparently, prisoners are required by the colleges to apply for Pell Grants. Eligible inmates are awarded Pell Grants which are paid directly to the colleges. I am unable to determine the amounts of Pell money received by each institution.

total revenues). During these years, the second largest revenue source was Spring Arbor scholarship grants. Commencing with the 1985–86 fiscal year, these two revenue sources switched places—the scholarships became the leading revenue source and the Pell Grants assumed second place. Janet Tjepkema, Spring Arbor's controller, estimates that the college will receive approximately the same amount in Pell Grants during 1988–89 as was received in 1987–88 ($179,593). Testimony of Janet Tjepkema, Apr. 11, 1989 at 13.

State aid has been the third most significant source of funding for the prisoner programs. State aid came in two forms: Michigan Differential Grants and Degree Reimbursement Grants. Differential grants are a type of enrollment-driven aid to private colleges such as Spring Arbor.

Degree Reimbursement Grants are awarded according to the yearly number of graduates. Spring Arbor received degree reimbursement grants from 1981 until the beginning of the 1985 fiscal year. Starting in 1985, Spring Arbor received a line item appropriation of $125,000 in the Department of Education budget instead of Degree Reimbursement grants and Michigan Differential Grants; thereafter, State funding was no longer based directly on the number of yearly graduates. Spring Arbor's appropriation was increased to $135,-000 for the 1986–87 fiscal year and again to $135,300 for the 1988–89 fiscal year. Spring Arbor stopped receiving Michigan Differential Grants at the commencement of the 1986–87 fiscal year.

In January 1987, Spring Arbor expanded its offerings to include four-year courses for women inmates housed at HVWF in addition to its long-standing commitment to the male prisoners at SPSM. As a consequence, Spring Arbor received $11,050 from the Department for the 1986–87 fiscal year. Spring Arbor also received $11,050 from the Department for fiscal 1987–88. This consideration was increased to $22,000 commencing with the 1988–89 fiscal year. In addition to the supplemental funding provided by the Department, Spring Arbor uses a portion of the Department of Edu-

cation appropriation to support the HVWF courses. Thus, Spring Arbor will receive $157,300 in State aid for three- and four-year post-secondary education during 1988–89. Of that, $22,000 will be used exclusively to support courses at HVWF.

E. *Efforts expended by the Department to comply with the court's 1981 order*

This is addressed in Parts I and II of this opinion.

F. *Specific manner in which the Department has not complied*

This is addressed in Parts I and II of this opinion.

G. *Estimated total cost and per capita cost of educational programs leading to two- and four-year degrees*

To the extent that total and per capita costs for two- and four-year educational programs may be inferred from amounts presently expended therefor, the discussion in sub-section D(i), *supra,* is relevant and incorporated here. In addition, I provide as Appendix E to this Opinion tables drawn from D.Ex. 120–25 indicating State Average Costs for Student Credit Hour and Student Contact Hour for assorted types of community college programming. [Appendix E omitted by the court for purposes of publication.] Of course, these tables represent average costs of providing community college courses statewide to prisoners and non-prisoners alike; what evidence there is suggests that the costs of prisoner programming are likely to exceed the average. Moreover, the community colleges are likely to find provision of educational programming to female prisoners more costly than to male prisoners because of the smaller overall number of the former.

I note in passing that the State Average Cost per contact hour for business and trade instruction, the two course areas that the Department is most likely to emphasize under the approach set forth in Act 324, is, on average, significantly greater than the $3.25 per contact hour provided by the Act. Thus, there is reason to credit plaintiffs' contention that implementation of Act 324

alone will not achieve parity of educational programming for the Department's female prisoners.

H. *Development of a detailed plan for remedying the equal protection violation through ordering expenditures for educational programs for women inmates on parity with those already being offered to men, if any, on a per capita, not a total expenditure basis, i.e., an educational program based on parity of expenditures rather than a plan requiring the same degrees, courses and subjects for both men and women*

The evidence presented does not permit reliable conclusions on the per capita or total cost of providing equal educational opportunity to the women inmates. Plaintiffs' Exhibit 49 offers evidence concerning average State post-secondary educational expenditure per FYES for male and female inmates. Yet, the information gathered in P.Ex. 49 depends on the untested and probably untrue premise that the community colleges apportion State aid to prisoner programming according to the percentage of total FYES that the prisoner students comprise. Moreover, the breakdown in P.Ex. 49 between male and female expenditures cannot be considered reliable. In addition to the numerous computational errors present in D.Ex. 100, it too is compromised by the untested premises affecting P.Ex. 49.

It is not likely that equality of per capita expenditure between male and female prisoners, if it existed, would provide parity of educational opportunity. The evidence indicates that a level of funding sufficient to sustain meaningful programming for the male prisoners will not suffice to support similar quality programming for the female prisoners. *See supra* Part II, at 834–835. Given the economic expectations of the community colleges and the relatively small pool of female inmates, per capita expenditure for female inmates will need to exceed per capita expenditure for male inmates if the former are to be afforded even a semblance of opportunity presently provided the latter. The fact that greater economies of scale can be achieved in the education of male prisoners does not mean that the Department should be permitted to satisfy its obligation to the female prisoners with the provision of equally costly, but substantively inferior, programming.

The Department's suggestion that parity has been achieved is belied by abundant evidence of the continuing disparity set forth in Parts I and II of this Opinion. The data necessary to provide reliable statistical inferences have not been presented. Even if available, valid statistical analysis would provide only a model of existing conditions, not the value judgments that give meaning to raw data.

The parties have offered at least six different measures of parity during the course of the 1989 hearings. In terms of expenditures, plaintiffs suggest that I consider State aid per prisoner FYES, P.Ex. 49 (Charts); the Department suggests that I look to the expenditure of total college revenues per prisoner FYES, D.Ex. 100 at 3. The parties seem to agree that the relative level of participation in educational programming is a valid measure of parity. Plaintiffs, however, suggest I analyze participation levels by comparing the number of female prisoner FYES to the number of male prisoner FYES, P.Ex. 49, Table 1; the Department would measure parity of participation by comparing the number of classes offered at men's facilities to the number offered at women's facilities. D.Ex. 117B; *see* Defendants' Closing Argument at 30–31; *see also supra* note 21 and accompanying text. Plaintiffs suggest that I consider the relative quality and range of the programs offered whereas the Department considers these less important. Plaintiffs would also have me consider the relative economic value, from the perspective of the student, of an education. *See* P.Ex. 49, Table 2 (purports to establish that education has greater economic value for men than for women).

Having considered the evidence and the arguments of counsel, I am convinced that the concept of parity as applied to this case cannot be reduced to a set of objective criteria that can be set forth in a single

comprehensive "detailed plan." This was the approach I tried with my Final Order in *Glover II*. It has not worked to date. To try again to outline a complete set of steps that the Department must take to achieve "parity" would be to condemn this court and the parties, like the daughters of Danaus, to draw water with a sieve. What is needed is a process whereby the conflicting concerns and demands of the Department, its female prisoners, and the educational community that must serve both, can be considered and accommodated. It is my responsibility to establish this process and to remain available to facilitate and maintain it. This court, however, has neither the necessary information nor experience in the field of education to proceed without expert advice. The evidence indicates that the Department also lacks the ability to develop and implement an effective remedy on its own. I must employ the learning and skills of an independent expert.

## PART IV—REMEDY

In October 1979, I found the rehabilitative programming then afforded to the Department's female prisoners to be substantially inferior to that offered its male prisoners. I entered an order outlining the required remedy. In 1981, I supplemented that outline with a more detailed decree. That decree was captioned a "Final Order." Now, ten years later, female prisoners are still not receiving the type of equal programming to which they are entitled. As recounted in Parts I and II, the Department has failed to implement my orders in almost every respect. An effective remedy must be supplied.

### (i) Contempt

I have before me plaintiffs' renewed motions for contempt. The Court of Appeals has suggested that I consider contempt proceedings as a remedy in this case. *Glover III*, 855 F.2d at 287. To succeed on their renewed motion for contempt, plaintiffs must establish by clear and convincing evidence that the Department has disobey-

ed extant orders of this court. *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1183 (D.C.Cir.1981). They need not establish that the Department failed intentionally to carry out the court's orders. *Id.* On the basis of the facts set forth in Parts I and II, I find that plaintiffs have sustained their burden.

In cases of civil contempt the "court ha[s] the power summarily to coerce obedience to [its] orders and to subject defendants to such conditional sanctions as [are] necessary to compel obedience." *United States v. United Mine Workers*, 330 U.S. 258, 330, 67 S.Ct. 677, 714, 91 L.Ed. 884 (1947) (J. Black concurring). The conditional sanctions may encompass fines or imprisonment. Fines or imprisonment are not the best remedies in this case. A remedy is needed which will result in parity. This elusive concept needs to be structured in this case by skillful individuals who can create programs which will meet the constitutional demand. The Department needs to be helped to provide parity.

The Department was impervious to the previous contempt citation in this case; the threat of a second contempt citation, which has loomed over the Department for close to three years, has had even less impact.

### (ii) *The Remedy*

The Court of Appeals found that I had not made the requisite factual findings to support the imposition of a court-appointed administrator. More important, the Court of Appeals found my previous remedy an "excessively intrusive interference" into the Department's operation of its penal system. In the fact of present noncompliance, and the Department's demonstrated unwillingness and inability to provide a remedy on its own, I must resort again to expert assistance.

It is the nondelegable duty of the members of the Michigan Corrections Commission to provide a remedy to correct the violations I have found.[30] Accordingly, the Commission itself shall appoint a Special Administrator to design and implement a

---

**30.** In addition to the duties imposed on the members of the Commission by virtue of their status as defendants in this lawsuit, I note their duties under Michigan law. *See* Mich.Comp. Laws Ann. §§ 201 *et seq.*, 791 (West 1982).

remedy for these violations. The Special Administrator shall be a full-time employee of, and subject to direction by, the Commission. The Special Administrator shall report only to the Commission. The Special Administrator shall receive compensation to be paid by the Commission commensurate with the Special Administrator's skill and learning. The Special Administrator shall have the following qualifications:

(a) Advanced training and experience in the provision, administration and finance of vocational and post-secondary educational programming for prisoner or non-traditional students;

(b) Advanced training and experience in penology and prison administration;

(c) A demonstrated commitment to the provision of rehabilitative programs to prison inmates;

(d) Demonstrated ability to lead complex, multi-party negotiations;

(e) An ability to interact with and understand the needs and interests of the women inmates;

(f) The Special Administrator may not be a present employee of the Department;

(g) The Special Administrator must not be encumbered by conflicting duties or obligations to any educational institution or state agency;

(h) The Special Administrator must make a minimum time commitment of two years to carry out these tasks.

The Commission shall submit the name of a proposed Special Administrator to this court within sixty days of the filing of this Opinion and Order. I will approve the Commission's appointment if the individual proposed meets the foregoing qualifications. The Commission and its Special Administrator shall have sixty days from the time I approve the appointment of the Special Administrator to develop a remedial plan. The Special Administrator must be given the chief responsibility—vis-a-vis all other Department employees or Commission appointees—to implement the plan.

In addition to a Special Administrator appointed by the Commission, I shall appoint a Monitor to report periodically on the progress of the Commission and the Special Administrator. The Monitor may at reasonable times inspect the women's prison facilities, interview inmates, and inspect institutional records. The Monitor will report his or her findings directly to the court. The Monitor shall have no authority to order the Commission to take any action, other than to require the inspections and interviews already mentioned, or to contract on its behalf.

The remedy outlined above is not overly intrusive. The Department has had ample opportunity during the last ten years to bring about parity in educational and vocational opportunities for women inmates. When State officials fail to fulfill their duty to cure constitutional violations, "judicial authority may be invoked." *Hutto v. Finney*, 437 U.S., 678, 687 n. 9, 98 S.Ct. 2565, 2572 n. 9, 57 L.Ed.2d 522 *quoting Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). "Once a right and a violation have been shown, the scope of the district court's equitable power to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann, id.* There is no reason to assume, as there was in *Kendrick v. Bland*, 740 F.2d 432 (6th Cir.1984), that the Department will act to alleviate the unconstitutional conditions on its own. In fact, it is abundantly clear that no improvement will occur unless this court intervenes. An effective remedy must intrude to a degree on the Department's prerogatives; the remedy supplied here is fully justified in light of the "long and unhappy history" of this litigation. *Hutto, id.* at 687.

The remedy is also the least intrusive effective remedy. As the Court of Appeals noted, I am not required to merely hope for compliance.

The court in *Kendrick*, a case relied upon by the Court of Appeals, observes:

Minimally intrusive relief may assume the form of an order enjoining a continuation of the practices, policies or conditions adjudged as constitutionally infirm whereby the state authority is charged with the responsibility of developing a program to safeguard against abridge-

ment of constitutional rights in the future. Such an injunction may be attended by the appointment of a monitor with authority to observe defendants' conduct and thereby permit the federal court to oversee compliance with its continuing order.

*Kendrick, id.* at 438 (citations omitted).

The remedy I now impose is less intrusive than my April 17, 1987 order appointing Dr. Meisler. It is the Commission, not I, that will appoint the Special Administrator. The Special Administrator will work under its direction and guidance. Thus, it will be the Commission, not the court, that proposes a remedial plan. The Monitor appointed by me will have access to all necessary information, but will have no authority to require the Commission or the Department to act.[31]

Since plaintiffs initiated contempt proceedings in January 1986, I have sought to achieve the necessary relief with the least possible intrusion into the affairs of the State prison system. At first I encouraged the parties to negotiate a settlement of their differences. When this failed, I tried to prod the Department to comply. As the Court of Appeals noted, I did not rule on plaintiffs' motion. I did not rule because contempt sanctions were no more likely to achieve compliance in 1986 than they are now. I appointed an administrator skilled in both education and penology because I understood the need for someone who could bridge the gulf between the Department, its prisoners and the State's educational community. My aim is not to punish the Department or to unduly interfere with its important mission. I require the Commission to appoint an expert administrator because the Department has been unable to comply on its own. The Department's focus must shift from the courtroom to the classroom. The development and implementation of a remedial plan must be among its highest priorities. The

female prisoners have gone too long without the type and quality of programming that the male prisoners already have.

An Order is entered herewith in conformity with this Opinion.

## ORDER

In conformity with the accompanying Opinion dated September 14, 1989:

1. The members of the Michigan Corrections Commission, Thomas K. Eardley, Jr., Robert Axford, Conrad Mallett, Jr., James H. Lincoln, and Duane L. Waters ("Commission"), have a non-delegable duty to cure the constitutional violations I have found;

2. Within sixty days of the entry of this Order, the Commission shall bring before this court the name of a proposed Special Administrator having the qualifications set forth in paragraph three of this Order;

3. The Special Administrator shall have the following qualifications:

(a) Advanced training and experience in the provision, administration and finance of vocational and post-secondary educational programming for prisoner or non-traditional students;

(b) Advanced training and experience in penology and prison administration;

(c) A demonstrated commitment to the provision of rehabilitative programs to prison inmates;

(d) Demonstrated ability to lead complex, multi-party negotiations;

(e) An ability to interact with and understand the needs and interests of the women inmates;

(f) The Special Administrator may not be a present employee of the Department;

(g) The Special Administrator must not be encumbered by conflicting duties or obligations to any educational institution or state agency;

---

**31.** In this vein I remind the Commission that it has the "burden to come forward with a plan that promises realistically to work, and promises realistically to work *now.*" *Green v. School Bd. of New Kent County,* 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968) (emphasis in original). In the event that the Commission should default again in its responsibility, I may resort to any means necessary and appropriate to cure the constitutional violations I have found.

(h) The Special Administrator must make a minimum time commitment of two years to carry out these tasks.

4. The Special Administrator shall become a full-time employee of, and subject to direction by, the Commission;

5. The Special Administrator shall report only to the Commission;

6. The Special Administrator shall receive compensation to be paid by the Commission commensurate with the Special Administrator's skill and learning;

7. If the Commission does not act as provided herein within sixty days from the date of the entry of this Order, a fine of Five Thousand and 00/100 Dollars ($5,000) a day will be levied against the Commissioners as persons acting in their official capacities or as individuals;

8. The Commission shall have sixty days from the time I approve the appointment of the Special Administrator to develop a remedial plan;

9. If the Commission does not act as provided herein within sixty days from the time I approve the appointment of the Special Administrator to develop a remedial plan, a fine of Five Thousand and 00/100 ($5,000) a day will be levied against the Commissioners as persons acting in their official capacities or as individuals;

10. The Commission shall assign the Special Administrator chief responsibility for implementation of the plan vis-a-vis all other Department employees or Commission appointees;

11. In the interests of justice (Federal Rule of Civil Procedure 21) and to carry out the remedies herein provided, current Michigan Corrections Commission members Robert Axford, Conrad Mallett, Jr. and James H. Lincoln are hereby added as parties to this suit. The court notes that Thomas K. Eardley, Jr. and Duane L. Waters are existing parties to this suit;

12. The Department shall make payment (overdue) to the Judith Magid Trust for the months of January, February and March, 1985 in the amount of Five Thousand Five Hundred and Fifty-seven Dollars and 50/100 ($5,557.50);

13. Plaintiffs' Motion for Entry of Judgment to Enforce Order is DENIED WITHOUT PREJUDICE; and

14. Plaintiffs' Motion to Certify a Question to the U.S. Court of Appeals for the Sixth Circuit is DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.